489 A.2d 536

## CONTINENTAL CASUALTY COMPANY

v.

## BOARD OF EDUCATION OF CHARLES COUNTY, Maryland et al.

**Misc. No. 7, Sept. Term, 1984.**

Court of Appeals of Maryland.

March 12, 1985.

Michael C. Warlow, Baltimore (H. Emslie Parks, Brian S. Goodman and Wright & Parks, Baltimore, on the brief), for appellant.

David A. Levin, Annapolis, and Edward S. Digges, Jr., La Plata (John J. Sellinger on the brief and Digges, Wharton & Levin, Annapolis, and Edward S. Digges, Sr., La Plata, on the brief), for appellees.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

RODOWSKY, Judge.

In this case the insurer and insured under a policy providing a form of directors' and officers' (D & O) liability insurance dispute the extent of the insurer's liability for counsel fees and expenses incurred by the insured in defense of a suit which alleged both covered and noncovered claims against the insured. The parties also dispute the liability of the insurer for the counsel fees and expenses incurred by the insured in prosecuting the instant action. We shall hold that fees and expenses which are reasonably related to the defense of a covered claim may ordinarily be allocated wholly to that covered claim. We shall also hold that the insurer is liable for the insured's fees and expenses in this case.

For a policy period of August 1, 1976, to August 1, 1979, Continental Casualty Company (CNA) issued to the Board of Education of Charles County, Maryland (the Board) a "Board of Education Liability Including School District Reimbursement Policy." The policy was issued with an optional broad form of coverage under which "Assureds" were "[a]ll persons who were, now are or shall be employed by the School District. . . ."

In the insuring clause of the basic policy CNA agreed

(a) With the Assureds that if, during the policy period any claim or claims are made against them ... for a Wrongful Act occurring during the policy period, the Insurer will pay on behalf of ... the Assureds ... for

all loss [sic] which the said Assureds or any of them shall become legally obligated to pay;

(b) With the School District that if, during the policy period, any claim or claims are made against the Assureds ... for a Wrongful Act occurring during the policy period, the Insurer will pay on behalf of ... the School District all loss for which the School District may be required or permitted by law to indemnify such Assureds.

By the "Liberalization Endorsement" the insuring clause was amended to add subparagraph (c) which reads:

"(c) With the School District that if during the policy period any claim or claims are made against it as a result of any Wrongful Act occurring during the policy period, the Insurer will pay on behalf of [sic] ... all loss which the School District shall become legally obligated to pay."

"Wrongful Act" is defined in the policy to

mean any actual or alleged errors or misstatement or misleading statement or act or omission or neglect or breach of duty by the Assureds in the discharge of their duties, individually or collectively, or any matter claimed against them solely by reason of their being or having been Assureds during this policy period.

By the "Liberalization Endorsement" to the basic policy, "Loss" was defined to

"mean any amount which the Assured or School District are legally obligated to pay, including, but not limited to, any amounts which the School District may be required or permitted to pay as indemnity to an Assured, for a claim or claims made against an Assured for a Wrongful Act and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation and defense of legal actions ... claims or proceedings and appeals therefrom, costs of attachment or similar bonds, provided always, however, such subject of loss shall not include fines imposed by the law, or matters

which shall be deemed uninsurable under the law pursuant to which this policy shall be construed." [1]

The policy provisions relating to "Costs, Charges and Expenses," as amended by the "Liberalization Endorsement," read:

"(a) The Assureds and/or the School District shall select and retain legal counsel to represent them in the defense and appeal of any claim, suit, action or proceeding covered under this policy, but no fees, costs or expenses shall be incurred or settlements made, without the Insurer's consent, such consent not to be unreasonably withheld."

"(b) The Insurer may at its option and upon request, advance on behalf of an Assured, and/or the School District fees, costs and expenses which have been incurred in connection with claims made against an Assured, prior to disposition of such claims, provided always that, in the event it is finally established the Insurer has no liability hereunder, each agrees to repay to the Insurer, upon demand, all monies advanced on their behalf pursuant to this provision."

The Board's policy from CNA provides for a $1,000 retention as to "[e]ach loss" and a limit of liability of $3,000,000 which is the "[m]aximum annual aggregate."

As a result of an exclusion also added by the "Liberalization Endorsement," the policy does not cover any "Loss" resulting from breach of a construction contract.[2]  Natural-

---

**1.** The basic policy definition of "Loss," which was replaced by the endorsement definition, was "any amount which the Assureds are legally obligated to pay or for which the School District may be *required or permitted to pay as indemnity to the Assureds,* for a claim or claims made against the Assureds for a Wrongful Act...."

**2.** As amended by the "Liberalization Endorsement," the exclusions section of the policy reads in relevant part:

IV.  Exclusions

"(b) The Insurer shall not be liable to make any payment for loss in connection with any claim against the Assureds, and/or the School District."

ly, the litigation which spawned the subject case arose out of a construction contract.

On or about August 10, 1976, the Board entered into a contract with Iorio Construction Co., Inc. (Iorio) under which Iorio was to build a new high school in La Plata, Maryland. By letter dated August 29, 1979, the Board, acting through the Superintendent of Schools, gave notice that it was terminating the contract. That letter "enclosed a copy of the Architect's recommendation for termination ... on the basis that [the Iorio] firm has failed to supply enough properly skilled workmen or proper materials to finish the project in a timely fashion." Iorio responded by letter of September 10, 1979, which in part reads:

> Your attempt at terminating our contract is absurd when viewed in the light of the incontrovertible fact that all of our work is virtually complete. The project has been occupied for months and has been in use by faculty, supervisory personnel and students. Your refusal to formally take occupancy of the project despite the fact that it has been operational and used for many, many months is unconscionable.

> Such tactics can only be explained by your expressed desire to withhold, for no cogent reason, our long overdue contract balance.

In October 1979 Iorio filed suit against the Board and others in the United States District Court for the District of Maryland.[3] Iorio's claims sounded both in contract and in tort. Among the Board's codefendants were certain governmental entities, the partnership of the project's archi-

---

. . . .
"(6) For any amounts due, under the terms of any contractual obligation; however, except with respect to construction or demolition contracts this exclusion shall not apply to fees, costs and expenses of the investigation, defense or appeal of any claim or suit or arbitration or administrative proceeding resulting from failure to perform or breach of any contract.

**3.** There is no issue before us as to whether this case involves a claim made within the policy period.

tects, two individual architects from that firm, and three Assureds under the CNA policy, M. William Runyon (Runyon), the Assistant Superintendent of Business and Supporting Services for the Board, Jesse L. Starkey (Starkey), Superintendent of Schools for the Board, and Joseph J. Lavorgna (Lavorgna), Director of School Facilities for the Board. The Board, in December 1979, asked CNA to acknowledge coverage of the claims asserted by Iorio against the Board and its employees. CNA in early 1980 denied coverage.

On March 6, 1981, the Board, Runyon, Starkey, and Lavorgna sued CNA in the United States District Court for the District of Maryland for a declaratory judgment (the Declaratory Judgment Action). The plaintiffs sought a judicial determination that CNA was obligated for their expenses, including attorneys' fees, in defending Iorio's suit against them and also in the Declaratory Judgment Action.[4]

The Board settled the Iorio suit in December 1982 so that the Declaratory Judgment Action has become a suit for damages and fees. There is no suggestion in the record that CNA has ever approved, or, after CNA took the position that there was no coverage, that CNA has been asked to approve, the defense conducted to the Iorio suit, the fees incurred by the Board or the settlement. In the course of proceedings in the Declaratory Judgment Action the federal court has concluded that certain claims in the Iorio suit were within the coverage of the CNA policy while other claims were not. Based on that preliminary legal ruling the Board has argued to the federal court that CNA was obligated to pay all of the legal fees and other ex-

---

4. The Declaratory Judgment Action also sought expenses, including legal fees, incurred in a federal court action brought by the Board against Iorio's bonding company in 1980. It appears that the bonding company, as assignee, subrogee, and surety for Iorio, adopted all of Iorio's claims against the Board and the Board officials. No party to the case before us makes any argument which distinguishes the Board's suit against the bonding company from Iorio's original suit against the Board and three of its officials for purposes of applying the CNA policy. Accordingly, we make no distinction in this opinion.

penses incurred by the Board in the Iorio suit while CNA has contended that an apportionment of those costs between covered and noncovered claims was required. At that point the federal court invoked the Maryland Uniform Certification of Questions of Law Act, Md.Code (1974, 1984 Repl.Vol.), §§ 12–601 to –609 of the Courts and Judicial Proceedings Article. The federal court has certified five questions to us, four of which deal with apportionment of litigation expenses between covered and noncovered claims. We shall state the precise questions and our answers to them in the course of analyzing the contentions of insurer and insured.

Review of the Iorio complaint is essential to an understanding of the issues raised in the litigation underlying the Declaratory Judgment Action. Iorio chose to divide its complaint into seven counts. The second and each succeeding count incorporate certain introductory allegations and all of the allegations of preceding counts. Counts I through III claim only against the Board and other governmental entities, but not against any individuals.

Count I alleges breach of the express construction contract and claims the difference between the contract price as "adjusted and fixed by the defendants" and the amount paid to Iorio. The difference is alleged to be $406,793. The second count seeks $298,313, allegedly representing the reasonable value of extras requested by the Board. Count III claims damages of $1,488,744, allegedly caused by delay attributable to the defendants. This count specifies sixteen aspects of the project as to which Iorio says it was impeded. These aspects range from an allegation that "the contract plans and specifications furnished required redesign" to an allegation that the defendants "interfered with local authorities in their inspection function to delay issuance of the temporary and permanent certificates of occupancy." Count IV claimed only against the architects. Count V was interpreted by the federal court to rest on *quantum meruit*. That count was apparently intended to be an alternative

to counts I, II, and III. It claims the total of the amounts sought in each of those three counts.[5]

In the sixth count Iorio sued only individuals. The contractor alleged that the defendant architects and officials of the Board had entered into a "corrupt agreement for the purpose of defrauding and injuring Iorio and in pursuance of their common scheme and conspiracy, caused and performed the acts complained of hereinabove." The *ad damnum* of count VI was $1,488,774.[6] Because this is precisely the amount of the *ad damnum* in count III, it is fair to interpret the "acts complained of hereinabove" as referring to the acts of hindrance specified in count III. Thus, tortious acts of Assureds allegedly occurred at each stage

---

**5.** The total claimed in counts I, II, and III is $2,193,850. Count V claims $2,193,880. Insofar as the pleading reveals, this $30 difference was not intended.

**6.** Count VI in its entirety reads:

SIXTH CAUSE OF ACTION AGAINST DEFENDANTS M. WILLIAM RUNYON, JESSE L. STARKEY, JOSEPH [J.] LAVORGNA, PHILIP VANDER MYDE, AND ART T. MOREY

44. Plaintiff repeats and realleges each and every allegation set forth in paragraphs "1" through "42" inclusive, and hereby incorporates the same as part of this Count, with the same force and effect as if fully set forth at length herein.

45. Upon information and belief, Defendants Runyon, Starkey, Lavorgna, Vander Myde and Morey, were engaged in carrying out a common scheme or plan to unlawfully, willfully, intentionally, maliciously and vindictively deprive Iorio of its right to expeditiously construct the Project in accordance with the plans and specifications.

46. Upon information and belief, Defendants, Runyon, Starkey, Lavorgna, Vander Myde and Morey, in pursuit of the common scheme or plan, and as part of a larger fraudulent or malicious design to injure Iorio or to personally benefit said Defendants, each participated in this corrupt agreement for the purpose of defrauding and injuring Iorio and in pursuance of their common scheme and conspiracy, caused and performed the acts complained of hereinabove.

47. The acts and omissions of the Defendants, Runyon, Starkey, Lavorgna, Vander Myde and Morey, were outside the scope of their normal duties of employment and obligations to their respective employers.

48. By virtue of the foregoing, Iorio has sustained damages in the sum of $1,488,774.00.

of the project from design to occupancy. Count VII of the complaint sounds in tort against all defendants and seeks damages measured by the loss allegedly caused to Iorio through diminished bonding capacity resulting from the conduct of the defendants with respect to the project.[7]

The federal court's interlocutory legal ruling is that CNA's policy afforded coverage with respect to counts VI and VII of Iorio's complaint. In count VI a claim is made against Assureds for a "Wrongful Act," and in count VII a claim is made against the Board and Assureds for a "Wrongful Act." The Board engaged counsel to defend and we infer that the Board is in effect indemnifying its three officials with respect to the costs of defense. The Board has become legally obligated to pay counsel and the litigation expenses. Those fees and costs allocable to counts VI and VII are a "Loss," as defined. CNA has promised to pay that "Loss." It has not. Thus we have a case of breach of contract by CNA.[8] The interrelated questions certified to us in effect ask what principles determine the proof of damages where the defense is to a suit making claims of "Wrongful Acts" and also making claims that are not of "Wrongful Acts."

The Board contends that CNA in effect breached an agreement to defend the entire Iorio suit so that the damages are measured by the cost of defending the entire suit.

---

**7.** The federal court found it unnecessary to decide whether count VII "is in the nature of a claim for malicious interference with contract, as the Board seemingly contends, or is more properly characterized as a claim for interference with prospective advantage, as Professor Prosser seems to suggest...."

**8.** Under the policy "Loss" also includes the amount paid in settlement of a claim for a "Wrongful Act." The relief sought in the Declaratory Judgment Action by way of reimbursement specifically includes settlements. In the certified questions and in the briefs and arguments of the parties to this Court, however, the focus is exclusively on attorneys' fees and other litigation expenses. Consequently, this opinion addresses only fees and costs. We intimate no opinion on how the policy might operate, if at all, with respect to the settlement of the Iorio suit. Indeed, the record before us does not even indicate the terms of that settlement.

The Board's argument is an effort to bring this case under the rule of *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975). That rule does not apply here.

*Brohawn* involved a homeowner's policy which included "Comprehensive Personal Liability" coverage. There the insurer promised

"[t]o pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage, and the *Company shall defend any suit against the Insured alleging such bodily injury* or property damage and seeking damages which are payable under the terms of this Section, *even if any of the allegations of the suit are groundless....*" [*Id.* at 400, 347 A.2d at 846 (italics in original).]

The suit arose out of an altercation with the plaintiff who alleged, alternatively, that the insured's harm-causing conduct was either an act of negligence or an assault. Negligence was covered by the policy but assault was excluded. Coverage, as it related to the insurer's obligation to pay damages, would not be determined until the jury characterized the facts as assault or negligence or neither. With respect to the duty to defend, however, we said:

Although the type of policy here considered is most often referred to as liability insurance, it is "litigation insurance" as well, protecting the insured from the expense of defending suits brought against him.... By clear and unequivocal language, [the insurer] has assumed the obligation of relieving its insured of the expense of defending an action alleging and seeking damages within the policy coverage. [*Id.* at 409–10, 347 A.2d at 851.]

In order to give effect to the duty to defend where the allegations, even if groundless, present claims both within and without the policy coverage the rule in Maryland is that "the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy." *Id.* at 408, 347 A.2d at 850 (italics in original).

In the case now before us the Board in effect equates Iorio's counts VI and VII with the negligence claim in *Brohawn*. Had Iorio's complaint gone to trial and a verdict and judgment been rendered based on count VI there would have been coverage (as to damages) under CNA's policy. Consequently, says the Board, that potentiality of coverage required CNA to defend the entire Iorio suit.

CNA on the other hand emphasizes that the subject policy is not a conventional liability policy. There is no "duty to defend" language; there is no reference to defense of groundless claims, and there is no conferral on the insurer of the right to select counsel and control the litigation. The Board counters by underscoring CNA's promise to pay fees and expenses in defending covered claims which the Board says is the substantial equivalent of a duty to defend.

The subject policy is a variation on a type of liability coverage initially offered to protect corporate directors and officers and now known as D & O. A form of D & O coverage is said to have been available through underwriters at Lloyd's since the 1940's, with the market for it having expanded rapidly in the mid-1960's. *See* Note, *Liability Insurance for Corporate Executives*, 80 Harv.L.Rev. 648 (1967). Policy forms have evolved and American companies have entered the field. As to D & O insurance generally, see J. Bishop, *The Law of Corporate Officers and Directors: Indemnification and Insurance* (1982 & 1984 Cum.Supp.) (ch. 8: "Directors' and Officers' Liability Insurance"); W. Knepper, *Liability of Corporate Officers and Directors* (3d ed. 1978) (ch. 20: "Liability Insurance") (Knepper); Hinsey, *The New Lloyd's Policy Form for Directors and Officers Liability Insurance—An Analysis*, 33 Bus.Law. 1961 (1978); and Johnston, *Corporate Indemnification and Liability Insurance for Officers and Directors*, 33 Bus.Law. 1993 (1978).

D & O coverage usually has two aspects. First it is intended to protect a corporation from its liability, either imposed by law or by a valid provision of the charter or

by-laws, to indemnify officers and directors, including indemnification for legal fees and expenses in litigation. Such policies are also generally designed to protect officers, directors, and other covered corporate employees both from liability to third persons and as to litigation fees and expenses when claims are made that they have committed a covered wrongful act as an officer, director, or employee. In the instant case the insuring clause in CNA's basic policy, without the "Liberalization Endorsement," was structured in this manner.

Knepper, ¶ 20.06, at 628, advises that "[a] program of D & O insurance for school district board members and employees is also written.... Premiums are based on the number of students, number of board members, and litigation history of the school district." At 628 n. 45 Knepper supports the statement by citation to a newspaper article appearing in 1972, entitled " 'CNA Announces Entry in Growing D & O Field.' "

Knepper, ¶ 20.16, also describes the defense of actions under D & O policies:

> It has been noted that "costs, charges and expenses" includes attorneys' fees and other defense costs. Thus the insurer should be consulted when counsel are retained to defend threatened or pending litigation. Under D & O policies the insured must provide its defense, although the insurer may participate at its option and may have a voice in selection of defense counsel. [Footnote omitted.]

Provisions of the subject CNA policy relating to defense are substantially different from the duty to defend clause of a conventional liability policy. Assureds and/or the Board, not CNA, select and retain defense counsel. "Loss," whether incurred by way of judgment, settlement, or defense costs, is charged against the policy limit without distinguishing between damages and legal fees. CNA has the option, but not the obligation, to advance expenses. CNA's consent, which is not unreasonably to be withheld, is to be obtained before expenses are incurred or settlements

made. If CNA advances expenses under the subject policy and "it is finally established the Insurer has no liability" under the policy, then each recipient of advances agrees to repay CNA all monies advanced on his or her behalf.

Here it has been established that counts VI and VII of Iorio's complaint asserted "Wrongful Acts" so that there is liability of CNA for the cost of defense attributable to those counts. That is not the same as a breach of the contractual duty to defend the entire suit under a policy and under a state of facts like those presented in *Brohawn.* Consequently, the damages here are not measured, as a matter of law, by the reasonable cost of defending the entire Iorio suit. That brings us to the problem of apportionment and to the certified questions.

Question 1 is:

Should the costs and expenses, including attorneys' fees, incurred by an insured under a policy of insurance, such as was written in this case, be apportioned between those counts of the suit against the insured for which there is insurance coverage and those counts for which there is no insurance coverage under the policy?

The answer is "Yes," as explained above.

Question 2 is the heart of the case. It asks:

If such apportionment is required, what standard should the finder of fact apply in apportioning costs and expenses, including attorneys' fees?

CNA urges that the services and expenses must be "reasonably and directly related to" covered claims. The Board advocates a standard under which the service or expense must be "reasonably related and supportive of the defense of" covered claims.

The question really asks what standard measures the damages to which the Board is entitled for CNA's breach of its contract. These damages can be measured in relation to the Board's expectation interest. The Board is entitled to be put in as good a position as it would have occupied had

CNA performed the contract. Counsel defending the Iorio suit could properly have billed CNA for all services and expenses reasonably related to the defense of counts VI and VII. Legal services and expenses are reasonably related to a covered count if they would have been rendered and incurred by reasonably competent counsel engaged to defend a suit against the Board and Assureds arising out of the same factual background as did the Iorio suit but which alleged only the matters complained of in counts VI and VII of the Iorio complaint.

■ Application of a reasonable relationship standard, as we have defined it above, will depend upon the facts. Nevertheless, in order further to clarify application of that standard, some generalizations about anticipated proof in the Declaratory Judgment Action are appropriate. Undoubtedly much of the work of defense counsel in the Iorio suit was factual preparation. It would have embraced review of the records involving the project in the possession or control of the clients, of codefendants, and of Iorio, either by formal discovery or by cooperation of counsel. It would have included interviews and depositions of individuals involved in the project. It seems likely that most if not all of this kind of factual preparation is reasonably related to the defense of count VI. Count VI is no more than a tort theory applied to the same facts which are involved in count III where the underlying theory is either a breach by the owner of an express provision of the construction contract or a breach by the owner of a duty implied in law not to hinder the contractor's performance. Both the tort and contract theories take the factual investigator through the entire history of the project.[9]

---

9. The acts complained of by Iorio in count VI are specified in ¶ 29 of count III. It reads:

29. During the course of the performance of the Contract by Iorio, the Defendants County Board of Education; Charles County; State Department of Education; State Board of Education; Board of Public Works; and State of Maryland, interfered with, retarded, and impeded Iorio's performance and expeditious completion of the

■    Preparation on the facts which may have gone be-
yond the history of the project and into subsequent jobs bid
on or performed by Iorio, and which may have gone into the
economic results to Iorio from jobs obtained or from jobs
sought but not obtained, would be related if it were not
excessively disproportionate to the risk of liability against
the Board or Assureds on the theory of count VII.

---

contract work required to be performed, and caused Iorio to work
in a dislocated, disruptive and uncoordinated manner, and other-
wise breached the Contract in that, among other things, they:

(a) prevented Iorio from performing the contract work within the
time specified in that the contract plans and specifications fur-
nished required redesign;

(b) delayed beyond a reasonable time therefor, the review and
approval of shop drawings and other submissions made by the
trades involved in the construction work and the prompt and
complete processing of any changes to the contract plans and
specifications;

(c) issued an excessive number of change orders resulting in
delays to the work;

(d) delayed approval of payment requisitions and progress pay-
ments;

(e) changed and redesigned the "site work" to be performed;

(f) failed to make payments to Iorio for work performed and
materials furnished in the amounts and at such times as were
required by the Contract;

(g) failed to schedule and coordinate the construction work, so
that Iorio could perform and complete the Contract within the time
and times provided therein, upon which time provisions Iorio relied
in fixing its prices for the said Contract;

(h) failed and refused to accept completion of the Project when
the New La Plata High School was completed under the Contract;

(i) failed to properly supervise, observe and inspect the project
during the course of construction;

(j) prepared and issued defective plans and specifications;

(k) issued erroneous interpretations of plans and specifications;

(*l*) failed to timely prepare change orders;

(m) failed to timely inspect the work to ascertain construction
progress;

(n) interfered with Iorio's relationship with its subcontractors;

(*o*) interfered with local authorities in their inspection function to
delay issuance of the temporary and permanent certificates of
occupancy;

(p) otherwise failed to perform their duties, obligations, and
responsibilities under the Contract.

■ To phrase our meaning of "reasonably related" in another way, we do not believe that CNA is entitled to an apportionment between tort and contract counts based simply on the fact that an item of legal service or expense would also be of use to counsel in defending a claim asserted under a contract count of the Iorio suit in addition to its use in defending a tort count. Having purchased this form of litigation insurance, the Board is entitled to the full benefit of its bargain. So long as an item of service or expense is reasonably related to defense of a covered claim, it may be apportioned wholly to the covered claim.

The unusual combination of the allegations of count VI with the fact that the Board, either justifiably or unjustifiably, terminated the construction contract bears on the reasonable relationship standard as applied to both legal and factual preparation by defense counsel. Count VI speaks of a conspiracy between Assureds and the architects to harm Iorio by impeding his performance of the construction contract.[10] The Board now argues to us that the contract claims of the Iorio suit and count VI are legally tied together by the legal principles applicable to conspiracies to induce a breach of a contract. This Court stated the rules in *Edison Realty Co. v. Bauernschub*, 191 Md. 451, 461, 62 A.2d 354, 358 (1948):

> A fraudulent conspiracy, sufficient to serve as the basis for an action in a civil case, is the confederation of two or more persons to cheat and defraud, when the design has actually been executed by the confederates with resulting damage to their victim. Since a breach of contract is unlawful, it is unlawful for a third person knowingly to aid the maker of a contract in breaking it. If the maker combines with others to break the contract, their conduct is a conspiracy which entitles the other party to the contract to recover against the conspirators any damages he may sustain.... But where the loss to the complainant was not caused by any breach of legal or equitable

---

10. See n. 6, *supra.*

duty, it is *damnum absque injuria* .... In this case the bill alleges a breach of contract, but there is no allegation of any specific act of fraud committed at the time of the execution of the contract, and no allegation of any specific act of conspiracy to break the contract. Consequently, the demurrers of the three co-defendants should be sustained.

*See also Damazo v. Wahby*, 259 Md. 627, 637–38, 270 A.2d 814, 819 (1970); *Western Maryland Dairy, Inc. v. Chenowith*, 180 Md. 236, 243, 23 A.2d 660, 664 (1942); *Robertson v. Parks*, 76 Md. 118, 135, 24 A. 411, 413 (1892).

■ It is not necessary for us on these certified questions, or for the federal court in the Declaratory Judgment Action, to determine whether the above principles would have been a legally valid defense to count VI of the Iorio complaint. If the proof in the Declaratory Judgment Action shows that counsel for the Board did in fact conceive of that legal theory as a defense to count VI while the Iorio suit was pending, and if the trier of fact in the Declaratory Judgment Action concludes that it was reasonable for counsel to pursue that theory of defense, then there may be a basis for a factual finding that legal research on Iorio's breach of contract theories is reasonably related to count VI. Otherwise, we are not able to speculate on a state of facts which would demonstrate a reasonable relationship between legal research, if any, directed to the liability aspects of the breach of contract legal theories and counts VI or VII. The theory of defense to count VI which the Board advances to us, if it were in fact pursued while the Iorio suit was pending, would be an additional basis for finding a reasonable relation between factual preparation of the total suit and count VI.

■ Finally, there are undoubtedly charges to the Board for the time of counsel which has been devoted to moving the Iorio case as a whole. This would include the preparation of motions and supporting memoranda, and the appearance of counsel before the federal court. Because the facts

underlying count VI also underlie the contract claims it again seems likely that most if not all of the time of counsel devoted to motions practice will turn out to be work which it would have been reasonable for counsel to have done if the Iorio case had alleged only counts VI and VII.

Question 3 is:

Which party (insurer or insured) bears the burden of establishing the apportionment of costs and expenses, including attorneys' fees, between the covered and non-covered claims pursuant to the standard discussed in question 2?

■■■ The insured has the burden of establishing that a given item of legal service or expense was reasonably related to the defense of counts VI and/or VII. The Board must prove its damages.[11]

Question 4 is:

If a division of costs and expenses, including attorneys' fees, pursuant to the standard discussed in question 2, cannot be accomplished, is the insured entitled to:

(a) recovery of all costs and expenses, including attorneys' fees;

(b) partial recovery of costs and expenses, including attorneys' fees; or

(c) no recovery whatsoever of costs and expenses, including attorneys' fees?

■■■ If the insured is unable to present proof of any damages caused by the breach of contract, that is, is unable to show that it has become legally obligated to pay counsel fees and expenses which are reasonably related to the defense of counts VI and/or VII, as we have explained that

---

11. Because we use "apportionment" to mean proving that claimed damages resulted from the breach, CNA did not, contrary to the Board's argument, waive the right to require "apportionment" simply by breaching the contract.

relationship in the answer to question 2, then the insured is entitled only to nominal damages.

Question 5 asks:

Is the insured entitled to recover from the insurer the costs and expenses, including attorneys' fees, incurred in the prosecution of the instant action?

Our answer is "Yes."

The general rule is that costs and expenses of litigation, other than the usual and ordinary Court costs, are not recoverable in an action for damages, nor are such costs even recoverable in a subsequent action; but where the wrongful acts of the defendant [have] involved the plaintiff in litigation with others, or placed him in such relations with others as make it necessary to incur expense to protect his interest, such costs and expenses should be treated as the legal consequences of the original wrongful act. [*McGaw v. Acker, Merrall & Condit Co.*, 111 Md. 153, 160, 73 A. 731, 734 (1909).]

In seeking to recover counsel fees and expenses reasonably related to the defense of covered claims in the Iorio litigation, the Board is seeking to have the general rule applied. The Board's claim in the Declaratory Judgment Action for counsel fees and expenses incurred in prosecuting the Declaratory Judgment Action does not fit within the rule as stated in *McGaw.* Nevertheless, this Court has sustained the award of counsel fees incurred by an insured in litigation with an insurer where the issue was whether the insurer was obligated to defend the insured against a claim asserted by a third party and where the insurer unsuccessfully maintained that it was not so obliged. The legal theory supporting this rule remains unrefined. *See Cohen v. American Home Assurance Co.*, 255 Md. 334, 363, 258 A.2d 225, 239 (1969) ("[W]hether one speaks in terms of [the insurer's] having authorized the expenditure by its failure to defend or whether one speaks in terms of the attorney's fees for the declaratory judgment action being a part of the damages sustained by the insured by

[the insurer's] wrongful breach of the contract, we hold [the insurer] bound to pay the fees incurred by [the insured] in bringing the declaratory judgment action to establish that [the insurer] had not done that which it had agreed with her to do."). *Cohen* represents an exception to the general rule stated in *McGaw*, and the exception is now firmly established. *See Bankers & Shippers Ins. Co. v. Electro Enterprises, Inc.*, 287 Md. 641, 648–49, 415 A.2d 278, 282–83 (1980); *Brohawn, supra,* 276 Md. at 415, 347 A.2d at 854; *Government Employees Ins. Co. v. Taylor,* 270 Md. 11, 22, 310 A.2d 49, 55 (1973); *Cohen, supra,* 255 Md. at 363, 258 A.2d at 239; *Anderson v. Maryland Casualty Co.,* 123 Md. 67, 71–72, 90 A. 780, 782 (1914); *American Home Assurance Co. v. Osbourn,* 47 Md.App. 73, 83–84, 422 A.2d 8, 14–15 (1980); *Maryland Automobile Ins. Fund v. Sparks,* 42 Md.App. 382, 395, 400 A.2d 26, 33, *cert. denied,* 285 Md. 733 (1979).

On certified question 5 CNA reiterates that the subject policy does not contain a duty to defend provision and points out that the Maryland cases holding an insurer obligated to pay counsel fees of the insured in the litigation between them involved policies with a duty to defend provision. On this phase of the instant case that distinction is meaningless. The cases between insurer and insured in which counsel fees of the insured were awarded as part of the relief to the insured were concerned primarily with which party, insurer or insured, would pay for the defense of the action brought against the insured by a third party. It makes no difference whether the duty to pay for the defense arises out of a promise to defend or whether it arises out of a promise to pay for "Loss," defined to include the cost of defense, when a claim is made against the insured for a "Wrongful Act."

CERTIFIED QUESTIONS ANSWERED AS ABOVE SET FORTH. COSTS TO BE EVENLY DIVIDED BETWEEN THE PARTIES.