The **POTOMAC ELECTRIC POWER COMPANY, Plaintiff,**

v.

**CALIFORNIA UNION INSURANCE CO., et al., Defendants.**

**Civ. A. No. 88–2091.**

United States District Court, District of Columbia.

Oct. 2, 1991.

Arnold M. Weiner, Steven A. Allen, Bruce L. Mann, Hazel & Thomas, Baltimore, Md., for plaintiff.

Dennis M. Flannery, James Robertson, John R. Read, Wilmer, Cutler & Pickering, Washington, D.C., for defendant Calif. Union Ins.

Thomas S. Schaufelberger, Scott P. Boylan, Drinker, Biddle & Reath, Washington, D.C., for defendant Empl. Ins. of Wausau.

Ignatius J. Melito, Stephen V. Kovarik, Siff, Rosen & Parker, P.C., New York City, for defendant First State Ins.

Barry R. Poretz, Laura E. Nachowitz, Jordan, Coyne, Savits & Lopata, Washington, D.C., for defendant Nat'l Union Fire.

Joseph S. Crociata, Gilberg & Kurent, Washington, D.C., David Morgans, Williams & Montgomery, Chicago, Ill., for defendant Southern Amer. Ins.

Michael Nussbaum, Jeffrey D. Robinson, Nussbaum & Wald, Washington, D.C., Thomas J. Quinn, Mary Ann D'Amato, John Spadaro, Mendes & Mount, New York City, for defendants London Market Insurers, North River Ins. Co., American Centennial Ins. Co.

Lewis R. Christ (Receiver), Director of Insurance, State of Mo., Jefferson City, Mo., Howard M. Berg, Berg, Tishe & Cottrell, P.A., Wilmington, Del., for defendant Transit Cas. Co.

MEMORANDUM OPINION (Pepco II)

JOHN H. PRATT, District Judge.

In our previous memorandum opinion of September 30, 1991, 777 F.Supp. 968, (*Pepco I*), we considered and acted upon five dispositive motions. The underlying facts which led to this litigation have been previously set forth and will not be repeated. Still pending are five additional dispositive motions, all of which were filed by one or more of defendants. We address them in turn.

1. *Defendants' Joint Motion for Partial Summary Judgment Regarding Costs Incurred in Connection with Criminal and Certain Other Proceedings*

In this motion, eight of defendant insureds[1] seek a ruling that many of the legal fees and other expenses incurred by Pepco as a result of the United Rigging

(hereinafter "U.R.") incident are not covered under the insurance policies at issue.[2]

The numerous legal proceedings began in the spring of 1985 when the environmental authorities of Maryland commenced an investigation of PCB contamination at the U.R. site in Beltsville. This inquiry led to Pepco and U.R. becoming the targets of two grand jury investigations, one conducted by the State of Maryland, and the other by the United States. In response to the state grand jury investigation, Pepco initiated a declaratory judgment action entitled *Potomac Electric Power Co. v. Stephen H. Sachs*, 639 F.Supp. 856 (D.Md.1986), ("*Pepco v. Sachs*"), in the District of Maryland. In this case Pepco sought a ruling that Maryland's environmental regulations were preempted by federal regulations. This case was lost in the district court and in the Fourth Circuit. While a petition for *certiorari* was pending before the Supreme Court, the state grand jury investigation ended without Pepco or any of its employees being indicted. As a result, the Supreme Court granted the petition for *certiorari* and remanded the case to the Circuit Court to dismiss on the ground of mootness.

The federal grand jury investigation ended in late 1988. Again, neither Pepco nor any of its employees were indicted.

In addition, the damage to the Beltsville site caused a flurry of lawsuits between U.R. and Pepco. U.R. first sued Pepco in the District Court for the District of Columbia. This suit was initially filed in October 1985, and shortly thereafter was dismissed for a year to allow settlement negotiations to proceed.

In July 1986, U.R. brought another lawsuit against Pepco in the District of Maryland. In this suit U.R. alleged Pepco had breached the contract which governed the

---

**1.** The eight defendants participating in these motions are California Union Insurance Company ("Cal Union"), North River Insurance Company ("North River"), London Market Insurers ("London or Lloyd's Defendants"), Wausau Insurance Company ("Wausau"), American Centennial Insurance Company ("American Centennial"), Southern American Insurance Company ("Southern American"), First State Insurance

Company ("First State"), and National Union Fire Insurance Company ("National Union"). The ninth defendant, Transit Casualty Co., is in receivership.

**2.** The insurance policies are described in Appendix One to *Pepco I.*

sale of the transformers.[3]

A third suit was filed by U.R. against Pepco in the District of Maryland in November 1986. In this suit, U.R. again sought damages for the PCB damage at Beltsville. Pepco counterclaimed for the $3.25 million it had spent to clean up the U.R. site. This second PCB case and the contract action were consolidated by the Maryland district court in April 1987. On August 17, 1987 Pepco and U.R. settled the consolidated Maryland suit. As part of the settlement agreement, Pepco paid U.R. $850,000, and agreed to assume liability for the $3.25 million Pepco spent to clean up the Beltsville site. Plaintiff alleges that the total legal fees resulting from the Beltsville incident were in excess of $2.6 million.[4]

(a) Relevant Policy Provisions

The relevant liability clauses of the policies issued by defendants to Pepco read as follows:

[t]he policy is to indemnify the insured … for any and all sums which the insured shall become legally liable to pay, and shall pay … as damages for personal injury or by reason of damage to or destruction of property.

Additionally, the policies contain an exclusion clause covering any pollution-related fines.[5]

(b) Discussion

Defendants in their motion make various arguments as to why portions of the total sum are, as a matter of law, excluded from coverage. They seek the following specific rulings: first, that $1,014,729.98 of these fees is not covered under the applicable policies because this is the sum Pepco expended to defend the company and its employees during the grand jury proceedings; second, that the legal fees Pepco incurred while the U.R. PCB action was stayed from October 1985 to November 1986 (which total $723,178.49) can not be recovered since there was no defense of the civil suits going on during this time; third, that the amount billed for services rendered after the PCB action was settled in August 1987 ($55,553.42) be excluded from coverage; and, lastly, that $908,604.50 paid to the law firm of Hogan and Hartson can not be recovered under the liability policies because Pepco has failed to disclose during discovery which of the relevant legal proceedings these fees were expended towards.

Plaintiff admits some of the legal fees which arose out of the Beltsville incident are not recoverable under the policies. As previously stated, plaintiff does not dispute that the fees it incurred in defending U.R.'s suit alleging breach of contract in the sale of transformers are not covered by the policies. Further, it admits any expenses incurred in evaluating Pepco's potential liability for federal and state civil penalties are not covered.[6]

■ The dispute over the remaining categories of legal fees can not be resolved by summary judgment. This is because there are genuine issues of material facts which prevent the resolution of this issue prior to trial. For those fees, which remain in dispute, we express the following thoughts for the guidance of the parties.

■ Any fees incurred solely for the purpose of representing the company and/or its employees before state and federal grand juries are not reimbursable under the policy. This is because fees expended in defending against possible criminal charges are not recoverable under a liability policy. There are two reasons for this. First, criminal punishments—fines and incarceration—are not "damages" caused to the property of another. *See Jaffe v. Cranford Ins. Co.*, 168 Cal.App.3d

---

3. Pepco conceded that the costs resulting from this lawsuit are not recoverable under any of the policies.

4. Complaint, ¶ 33.

5. *See, e.g.,* North River Insurance Company Excess Liability Policy No. JU 1064, submitted as Exhibit 29 to Defendants' Joint Statement of Material Facts.

6. Plaintiff's Consolidated Memorandum In Opposition To Defendants' Motions for Summary Judgment at 153 n. 183.

930, 214 Cal.Rptr. 567, 570 (1985) (" '[d]amages' describes a payment made to compensate a party for injuries suffered"; criminal actions do not seek damages); *Stein v. International Ins. Co.,* 217 Cal.App.3d 609, 266 Cal.Rptr. 72, 75, *mod., reh'g denied,* 217 Cal.App.3d 1450 (1990) ("[i]t is well established that an insurer is not required to provide a criminal defense to an insured under a liability policy obligating the insurer to pay 'damages' "). Further, it has been suggested that allowing fees spent on a criminal defense to be recovered under a liability policy would violate public policy. *E.g.,* 1 G. Couch, *Cyclopedia of Insurance Law* 114–15 (2d ed. 1984); 6C J. Appleman, *Insurance Law and Practice* 404 (1979); *Shew v. Southern Fire & Casualty Co.,* 307 N.C. 438, 298 S.E.2d 380, 384 (1983); *cf. Curry v. Giant Food Co.,* 522 A.2d 1283, 1290 (D.C.1987) (other jurisdictions have held it would defeat public policy to allow an insurer to indemnify punitive damages).[7]

Most importantly, Pepco has raised a genuine issue that at least some of the expenses it had previously allocated to the defense of the grand jury proceedings would have accumulated even if there had been no grand jury proceedings. Pepco claims that the expenses for these criminal proceedings would have arisen even if there had been only civil proceedings resulting from the Beltsville incident. To determine how to allocate these expenses between the covered (civil suits) and uncovered (criminal proceedings) claims, we will follow the reasoning of a Maryland Court of Appeals case, *Continental Casualty Co. v. Board of Education,* 302 Md. 516, 489 A.2d 536 (1985) [8] which held that if fees

and expenses were incurred in connection with a covered claim, but were also involved in an uncovered claim, then if the fees and expenses of the uncovered claim "are reasonably related to the defense of a covered claim [they] may ordinarily be allocated *wholly* to [the] covered claim." *Id.* at 538 (emphasis added). The Maryland Court of Appeals also set forth the relevant standard a finder of fact must use to determine whether expenses incurred with respect to uncovered claims can be apportioned to covered claims; namely:

> Legal services and expenses are reasonably related to a covered count if they would have been rendered and incurred by reasonably competent counsel engaged to defend [a covered claim].

*Id.,* 489 A.2d at 544.

In the instant case, Pepco argues that costs arising from the factual investigation and representation of the company and individuals before the grand jury, and in the preemption action, *Pepco v. Sachs,* were reasonably related to the defense of the civil PCB cases brought by U.R. In our prior opinion, we held that the civil PCB cases represented a claim for damages falling under the liability umbrella of defendants' policies. Thus, if Pepco can prove that the expenses, incurred in the defense of the criminal proceedings and in filing the preemption action, were reasonably related to the PCB civil suit, then all the fees and expenses claimed by Pepco as legal fees in this case should be reimbursed by the insurers.

Defendants contend that an affirmative suit brought by an insured is *per se* unrecoverable as a defense cost. However,

---

**7.** Plaintiff cites a number of cases which it contends stand for the proposition that it does not violate public policy for an insurer to provide a defense for an insured charged with fraudulent acts. *E.g., Hartford Life Ins. Co. v. Title Guarantee Co.,* 520 F.2d 1170, 1175 (D.C.Cir.1975); *Donnelly v. Transportation Ins. Co.,* 589 F.2d 761, 768 (4th Cir.1979); *PepsiCo, Inc. v. Continental Casualty Co.,* 640 F.Supp. 656, 660 (S.D.N.Y.1986). These cases are easily distinguished on two grounds. First, they all stem from disputes over civil actions brought against the insured. A criminal action in this context is fundamentally different than a civil lawsuit, and

therefore mandates a different result. Secondly, all the above cases involved a duty to defend whereas the instant action concerns a duty to pay. There is no duty to defend clause in any of the policies at issue.

**8.** We adopt the reasoning of a Maryland case because we have found no District of Columbia case on point. We note that in our previous order, we held that District of Columbia law applied to this case. *See Pepco I* at 971–974. Our adoption of the reasoning of this Maryland case should not be interpreted in any way as calling into question this prior ruling.

plaintiff has brought to our attention two cases which rebut this contention. *See Simon v. Maryland Casualty Co.,* 353 F.2d 608 (5th Cir.1965) (holding that because an affirmative suit was the only way the insured could protect its rights, the insurer should have provided a defense); *American Home Assurance Co. v. Miller,* 717 F.2d 1310 (9th Cir.1983) (same).

■ To repeat, this is not a matter that can be resolved at the summary judgment stage, as it presents genuine issues of fact. It is for the fact-finder at trial to determine which, if any, of the work done for the defense of the grand jury proceedings and the affirmative *Pepco v. Sachs* suit was reasonably related under the *Continental Casualty* test. For example, Pepco contends, and it is for the finder of fact to decide, that the factual investigation Pepco's lawyers performed for the defense of the grand jury proceedings was also used in the civil PCB cases. Also, Pepco has introduced evidence which raises a genuine issue that the preemption suit, *Pepco v. Sachs,* was brought to improve Pepco's position not only in the criminal investigations, but additionally in the civil PCB action.[9]

We similarly reject defendants' contention that Pepco's legal fees during the period the PCB action was stayed can not be recovered and that the $55,553.42 billed for services rendered after the PCB action was settled must be excluded from coverage. Again, whether these expenses are properly considered "damages" under defendants' policies must be determined by the trier of fact.

Finally, we address defendants' contention that the legal fees Pepco paid to the firm of Hogan and Hartson should not be indemnified because Pepco failed during discovery to inform defendants as to which of the applicable legal proceedings the fees were incurred. Again, this issue can not be properly resolved by summary judgment. Plaintiffs have submitted the Affi-davit of George Mernick, a lawyer with Hogan and Hartson, which allocates the relevant fees to the appropriate legal proceedings.[10] With this affidavit, it is clear that there is a genuine factual issue as to how the Hogan and Hartson fees should be allocated. Therefore, we deny Defendants' Joint Motion for Partial Summary Judgment Regarding Costs Incurred in Connection with Criminal and Certain Other Proceedings.

*2. Defendants' Joint Motion for Summary Judgment Arising From Pepco's Failure To Obtain Consent For Its Clean Up of the Beltsville Site*

In this motion defendants seek summary judgment based on Pepco's alleged failure to obtain their agreement prior to entry of an Administrative Order entered into by Consent with the Federal and State environmental authorities in July 1985. To explain our action in denying this motion, it will be helpful to review Pepco's communications with the defendants. These facts are also germane to the remaining three summary judgment motions, all of which allege Pepco failed to notify certain defendants of the Beltsville incident.

(a) The Consent Order of July 29, 1985

Shortly after the federal and state environmental officials discovered the PCB contamination at the U.R. site, Pepco sent notice of the incident to Johnson & Higgins, the insurance brokerage firm Pepco used to procure most of the policies at issue in this case. This notice was dated May 22, 1985.[11] On May 24, 1985, Pepco sent an identical notice to the law firm of Mendes & Mount, the representative of defendant Lloyd's insurers. Mendes & Mount sent Pepco an acknowledgement of this notice on June 18, 1985. In this letter, Mendes & Mount clearly stated that the Underwriters (the Lloyd's insurers) com-

---

**9.** See Plaintiff's Consolidated Memorandum In Opposition To Defendants' Motions for Summary Judgment at 173 and Exhibit 84 to Plaintiff's Rule 108(h) Counterstatement.

**10.** *See* Plaintiff's Rule 108(h) Counterstatement ("Plaintiff's Counterstatement"), Exhibit 76.

**11.** Plaintiff's Counterstatement, Exhibit 111.

pletely reserved their rights.[12] Two other insurers responded to this notice.[13] None of the other defendants, including the primary defendant, Cal Union, responded to Pepco's May 1985 notice.

Meanwhile, Pepco, U.R. and the federal and state environmental authorities were negotiating an agreement whereby Pepco and U.R. would agree to clean up the environmental damage to the Beltsville site and that should Pepco and U.R. fail to do this, fines in favor of the respective governments would be imposed. An Administrative Order by Consent memorializing this agreement was signed on July 29, 1985.[14]

(b) The Settlement Agreement Between Pepco and U.R. of August 17, 1987

Pepco and U.R. then proceeded to clean up the Beltsville site prior to reaching a formal settlement agreement. Pepco advanced the funds for the work done, and U.R. supplied the use of its equipment and employees. As recited above, in October 1985 U.R. sued Pepco for the damages the PCB oil caused to the Beltsville site. This suit was stayed for one year and then re-filed in November 1986. When Pepco and U.R. began negotiating a settlement agreement, Pepco notified Johnson & Higgins on March 24, 1987 stating that "preliminary settlement negotiations" with U.R. were underway and asking Johnson & Higgins to "identify a person who would be able to respond promptly if any proposed settlement can be reached."[15] The response from the insurers was again minimal. First State wrote Pepco that it was reserving all rights. Cal Union formally denied coverage based on the pollution exclusion clause. None of the other defendants responded.

After Pepco and U.R. had outlined a proposed agreement, Pepco notified Johnson & Higgins, Mendes & Mount, Cal Union, North River, American Centennial, and Southern American of the proposed agreement and informed the insurers that unless they objected to the agreement by a certain date, the settlement agreement would go forward.[16]

On August 17, 1987 the settlement agreement between Pepco and U.R. was signed. In this agreement, Pepco agreed to assume liability for the monies it had spent in the clean-up. Pepco also paid U.R. $850,000.

Each one of the insurance policies at issue in this case contains a clause that requires the insured to obtain consent from the insurer before entering into a settlement agreement.[17]

(c) Discussion

Defendants assert that they are entitled to summary judgment because Pepco failed to comply with the consent to settlement provision of the policies by failing to obtain the consent of defendants prior to signing the July 1985 Administrative Order by Consent ("Consent Order"). However, whether the Consent Order was a settlement agreement is an issue of fact. The court can not declare the Consent Order to be a settlement agreement as a matter of law for a number of reasons. First, the Consent Order was not a claim for damages. Second, Pepco never paid any fines to the United States Environmental Protection Agency or to the State of Maryland. Lastly, the Consent Order specifically leaves open the possibility that Pepco could be sued by either of these two entities.

**12.** *Id.,* Exhibit 113.

**13.** Southern American Insurance Company responded to this notice in July of 1985. Southern American made it clear it was expressly reserving its rights. *Id.,* Exhibit 114. North River and Wausau responded through their representative Willis, Faber & Dumas. *Id.,* Exhibit 115.

**14.** A copy of the agreement is submitted as Exhibit 9 to Defendants' Joint Statement of Material Facts.

**15.** *Id.,* Exhibit 154.

**16.** *Id.,* Exhibits 157–59. Various insurers responded to this notice in different ways. Southern American complained it was given insufficient notice. Mendes & Mount did not respond until September 4, 1987, two weeks after the settlement agreement was signed. Cal Union did not respond at all.

**17.** *See* Defendants' Joint Statement of Material Facts, ¶¶ 165–66, 168–72.

The real claim for damages in this case was asserted by U.R. The Consent Order of July 29, 1985 did not determine whether Pepco or U.R. would be liable for the clean-up costs. This was not accomplished until Pepco and U.R. settled the civil lawsuit between them on August 17, 1987. Other than the three insurers (National Union, Wausau and First State) who complained they did not receive notice of the proposed settlement agreement and/or that this notice was untimely, it appears that the remaining defendants began to receive notice of the U.R. lawsuit in March 1987, and received a final request for their consent of the proposed settlement agreement with U.R. on August 3, 1987. Whether the notice was timely, and whether the defendants unreasonably declined to give their consent to the agreement, are questions of fact.

We will now address the individual summary judgment motions that are based on Pepco's alleged failure to provide notice to certain defendants.

3. *Motion by Defendant National Union Fire Insurance Company of Pittsburgh, Pa. for Summary Judgment On The Ground of Lack of Notice*

National Union provided excess coverage for Pepco for the period of a single year, March 1, 1980 through March 1, 1981. National Union's policy provided coverage in the amount of $500,000 which was part of $5 million of second-layer coverage. This coverage was in excess of the first $1 million spent for which Pepco retained self-insurance, and $4 million in first-layer coverage provided by other companies. The National Union policy followed form of a North River policy, the primary excess policy for that year.[18]

The National Union policy itself contains no express notice provision. Thus, we look to the North River policy's notice provisions. Two provisions of the North River policy are material to the issue of notice. First, on the bottom of the "Declarations" page opposite a space for the signature of "Authorized Representative," Johnson & Higgins' name and address appear.[19] Second, Clause 9 of the notice provision states:

Upon the happening of an occurrence notice shall be given by or on behalf of the Insured to the Company or its representatives ... Notice given by ... the Insured ... to any representative of the Company ... shall be deemed notice to the Company.[20]

Pepco asserts that in early 1980 it entered into an agreement with its insurance broker, Johnson & Higgins, in order to change the notice provisions of Pepco's liability policies. According to Pepco, the parties at that time agreed that notice of a claim would be given to Johnson & Higgins, which would in turn be responsible for passing the notice of the claim onto the insurers.[21] To reiterate the facts recited above, Pepco first notified Johnson & Higgins of the Beltsville incident in May 1985,[22] and beginning in October 1985, periodically informed Johnson & Higgins of the developments in the U.R. suit.[23]

National Union bases its motion for summary judgment on the assertion that Johnson & Higgins never forwarded this notice to National Union, and therefore Pepco failed to comply with the notice provisions of its policy. We must determine who should bear responsibility for Johnson &

18. The National Union Policy, No. 978 25 36, is submitted as Exhibit A to National Union's motion; The North River Policy, No. JU 0817, is submitted as Exhibit B.

19. Plaintiff's Counterstatement, ¶ 328, and Exhibit 101.

20. Clause 9 of North River Policy Number JU 0817. Submitted as Exhibit B to National Union's Motion for Summary Judgment on the Grounds of Lack of Notice.

21. Johnson & Higgins was used to procure all Pepco's liability policies from the period of December 31, 1978 to October 31, 1984, except for the period March 1, 1981 through October 31, 1981. Plaintiff's Counterstatement, ¶ 319.

22. *Id.*, Exhibit 341.

23. *Id.*, Exhibits 108–09.

Higgins' failure to notify National Union of the Beltsville incident.

■ Under District of Columbia law, whether an insured has acted reasonably in giving notice is usually a question of fact for the jury. *Starks v. North East Ins. Co.*, 408 A.2d 980 (D.C.1979). As the District of Columbia Court of Appeals stated in *Starks:*

> Even in a case involving uncontradicted evidence, the question whether the insured has acted reasonably becomes a question of law only when reasonable persons can draw but one inference and that inference points 'unerringly' to the conclusion that the insured has not acted reasonably under the circumstances.

*Id.* at 982. Whether Pepco's attempts at notice were reasonable under the circumstances must be left to the trier of fact, as reasonable minds could differ in their interpretation of the pertinent events.

■ First, we note that the language of the policy states that notice is to be given to "any representative of the company." This provision is ambiguous, and therefore must be interpreted in a manner most favorable to the insured. *Loffler v. Boston Ins. Co.*, 120 A.2d 691, 693 (D.C.Mun.App. 1956); *Meade v. Prudential Ins. Co.*, 477 A.2d 726, 728 (D.C.1984). Also, the policy does not mandate that notice must be given to "an authorized representative." Rather, "any representative" is sufficient.

■ Pepco has also presented sufficient evidence so that the question of whether Johnson & Higgins was an agent of National Union is a disputed issue of fact. *See* 3 G. Couch, *supra*, § 25:94, at 447–48 ("whether a broker is the agent for the insured or the insurer is ordinarily one of fact for determination by the jury").[24] Specifically, Johnson & Higgins' name appeared on the front of the North River policy with the labeling "Authorized Representative." *Cf. Mitchell Buick & Oldsmobile Sales, Inc. v. National Dealer Services*, 138 Ill.App.3d 574, 93 Ill.Dec. 71, 77–78, 485 N.E.2d 1281, 1287–88 (1985) (when agent's name appeared on policy as "Authorized Representative" it was reasonable for insured to give notice to the agent); *State Security Ins. Co. v. Goodman*, 6 Ill.App.3d 1008, 286 N.E.2d 374, 377 (1972) (when broker was named as a representative on the face of a policy, broker was deemed to be "an authorized agent insofar as notice is concerned"). In addition, Pepco avers that it specifically sought to make Johnson & Higgins the insurers' agent for the purpose of receiving notice when it met with Johnson & Higgins in January 1980.[25] Lastly, Pepco has proffered evidence which demonstrates that Pepco sent notice through Johnson & Higgins to National Union in the past. Indeed, defendant National Union admits in its reply brief that on previous occasions it received notice of liability claims through Pepco's broker.[26] Pepco should have the opportunity to establish that the practice of sending its notice to National Union through Johnson & Higgins established a course of dealing between the parties. *See* 4 G. Couch, *supra*, 253–54 ("[n]otice may be given or proof of loss furnished to a broker who has acted as an intermediary between the insured and the insurer where it has been customary for the insured so to give notice"). We leave the final resolution of the reasonableness of Pepco's notice to the finder of fact.[27] Therefore, we deny National Union's motion for summary judgment.

**24.** Under District of Columbia law, whether a party is the agent of another is a question of fact, and the party asserting the agency relationship has the burden of proving the agency relationship existed. *Henderson v. Charles E. Smith Management, Inc.*, 567 A.2d 59, 62 (D.C.1989); *Rustler's Steak House v. Environmental Associates, Inc.*, 327 A.2d 536, 539 (D.C.1974).

**25.** *See* Plaintiff's Consolidated Opposition at 214–16.

**26.** National Union's Reply to Pepco's Opposition to National Union's Motion for Summary Judgment on the Grounds of Lack of Notice at 16.

**27.** Defendant National Union asks us to follow a case decided by another judge of this court which held, after a two-day trial, that notice to the broker was not sufficient notice: *Travelers Indem. Co. v. Booker*, 657 F.Supp. 280 (D.D.C.1987). However, the holding of that case is very fact specific. The court found that the insured did not request the broker to notify

4. *Motion By Defendant Employers Insurance of Wausau For Summary Judgment Based Upon Lack of Notice*

■ The Wausau policy covered the period October 31, 1981 to October 31, 1982. This policy covered one-half of a $4 million limit of liability in excess of a $1 million self-insured retention held by Pepco.[28] The Wausau policy followed form of a North River policy, which had the same notice clause recited in the previous section of this opinion.[29]

Like National Union, Wausau claims it never received notice of the Beltsville incident until a copy of the complaint in the instant case was served upon it. Pepco maintains it complied with the notice provision since it notified Johnson & Higgins of the incident and because Johnson & Higgins forwarded this notice to its correspondent broker in London, Willis, Faber & Dumas ("Willis, Faber").[30] Pepco maintains notifying Willis, Faber was reasonable notice since the policy at issue contained a "Declarations" page which stated that if a claim should arise under the policy, notice should be given to Willis, Faber.[31] Pepco has also proffered evidence that in the past, notice of claims on Wausau policies were sent to Johnson & Higgins.[32]

Thus Wausau's request for summary judgment is based on the same grounds as that of National Union: they admit that Pepco notified the broker of the claim, but complain that notice was inadequate since the broker failed to notify the insured. For the reasons given in denying National Union's motion, we deny Wausau summary judgment, and leave it for the fact-finder to determine whether notice was reasonable under the circumstances.

5. *Motion of Defendant First State Insurance Company For Summary Judgment Based Upon Lack of Notice*

■ The First State policy at issue in this case also covered the period of October 31, 1981 to October 31, 1982. It provided coverage for $5 million in excess of $4 million over Pepco's $1 million self-insured retention.

First State's policy, however, differs from that of National Union and Wausau in that it contains its own notice provision which states:

> The insured upon knowledge of any occurrence likely to give rise to a claim hereunder shall give immediate written advice to the Company.[33]

First State admits that it first received notice of the Beltsville incident and the U.R. suit "on or about" April 17, 1987.[34] Pepco, however, claims that since the First State policy follows form to the North River policy, the North River's policy language of notice to "any representative" of the company controls. Pepco maintains representatives of First State included its general managing agent, Cameron & Colby, and the wholesale broker utilized by Cameron & Colby, Avreco.

Pepco claims that First State should have received notice of the Beltsville incident in January 1986. Pepco contends that on January 7, 1986, Avreco received from Johnson & Higgins a notice from Pepco, and that

---

the defendant insurer because neither the plaintiff nor its broker believed the occurrence was of the type covered by defendant insurer's policy. In the instant case, when Pepco notified Johnson & Higgins of the incident, it stated in its initial letter that the "purpose of this communication is to notify you *and the underwriters* of this incident." Plaintiff's Rule 108(h) Counterstatement, Exhibit 111 (emphasis added).

28. The Wausau policy is Exhibit 30 to Defendants' Joint Statement of Facts.

29. This policy is Exhibit 29 to Defendants' Joint Statement of Facts.

30. According to Pepco, Wausau concedes that Johnson & Higgins forwarded Pepco's notices of the Beltsville incident to Willis, Faber.

31. *See* Plaintiff's Rule 108(h) Counterstatement, Exhibit 110.

32. *Id.*, Exhibit 163.

33. The First State Policy, Excess Liability Policy No. 914197, is attached as Exhibit A to The Affidavit of Stephen V. Kovarik, submitted with First State's Motion.

34. *Id.* at 5.

Avreco prepared a "buck slip" listing the three insurance companies which should receive a copy of the notice. These companies are Cal Union, Transit Casualty, and First State. Apparently, Cal Union and Transit Casualty have both produced a copy of this notice in discovery, and only First State claims never to have received the notice. Pepco again argues that the course of dealing between First State and Pepco was for Pepco to send notice of claims through Johnson & Higgins.[35]

Thus, once again, the Court is confronted with a situation where the agent failed to forward notice of a claim to the insurer. The motion of First State is analogous to the motions of National Union and Wausau, and for the same reasons is denied. Whether Pepco's attempts at notice were reasonable under the circumstances must be left to the trier of fact.

---

**35.** Plaintiff's Consolidated Opposition at 238.