MARYLAND AUTOMOBILE INSURANCE FUND *v.*
DUDLEY KENNETH SPARKS ET AL.

[No. 1296, September Term, 1978.]

*Decided April 20, 1979.*

The cause was argued before MORTON, THOMPSON and LOWE, JJ.

*Thomas E. Plank, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General, John J. Corbley, Neal D. Peterson* and *John Addison Howard* on the brief, for appellant.

*William C. Stephens* for appellee Sparks. Submitted on brief by *Joseph W. Pitterich* for other appellee.

LOWE, J., delivered the opinion of the Court.

For purposes of this appeal the pertinent facts indicate that a declaratory judgment was prayed by appellee to determine whether he was covered by the insurance of the Maryland Automobile Insurance Fund (MAIF) on the night of July 30, 1976. A summary judgment motion by MAIF was twice denied and substantial testimony taken, at the conclusion of which appellee was granted, and MAIF was denied, a directed verdict.

> "MAIF appeals from Judge Chasanow's denial of its motion for summary judgment; from Judge Ross' denial of its motion for summary judgment; from Judge Ross' denial of its motion for a directed verdict at the close of the plaintiff's case; and from Judge Ross' grant of the plaintiff's motion for a directed verdict and denial of MAIF's motion for directed verdict."

Appellant asks five questions and three alternative ones to the first. It is not necessary to address them all, however, because the primary issue turns upon an interpretation of a statute that is not sufficiently ambiguous to permit interpretation. *Wheeler v. State,* 281 Md. 593, 596 (1977); *Amalgamated Ins. v. Helms,* 239 Md. 529, 535 (1965). Thus, appellant's step-by-step progression of error which it assigns to the trial judge in reaching the conclusion that MAIF did insure appellee on the night of his accident is unnecessary.

## — the controversy —

The appellee, Dudley Kenneth Sparks, at 11:00 a.m. on July 30, 1976, called Zane Jontiff, a vice president of Cosmopolitan Insurance Agency, Inc., and appellee's primary agent for a MAIF policy the preceding year. Jontiff advised Sparks that his policy had expired the preceding day. Sparks asked to "renew" his policy and was asked to stay on the telephone line while the matter was checked out. Jontiff returned to advise Sparks of the amount of his premium ($485), whereupon Sparks received approval from Jontiff to pay the premium all at once. Sparks immediately wrote out a check which he mailed to Cosmopolitan agency within 20 minutes of the conversation. The agency received the check the following day; however, the previous night, July 30, at 10:30 p.m., after the check was mailed but before it was received, appellee Sparks had an accident for which he was sued by several injured parties.

Upon receipt of the check Cosmopolitan had filled out a renewal questionnaire form, and had prepared a binder notice to MAIF indicating coverage was to begin at 12:01 a.m., August 1st, 1976. The binder notice to MAIF was postmarked on August 1, 1976.

MAIF contends that it had properly established a rule — MAIF Binding Rule 12.05.02.11 — which specifies that coverage will begin

> " ... at 12:01 a.m. of the day following the date shown on the postal cancellation;"

And, as a consequence, Sparks' policy did not commence until 12:01 a.m., August 2, 1976, and would terminate at that same day and time the succeeding year.

The court, in its collective rulings, declared that coverage did exist at the time of the accident, reasoning variously, that MAIF"s rules were improperly adopted and did not bind appellee and that the Legislature "intended" that "renewals" be handled by MAIF without coverage lapse; all of which was predicated upon interpretively finding a statutory method of binding coverage independent of rules or regulations. This procedure was found in Md. Ann. Code art. 48A, § 243B (d) (1) (1972 Repl. Vol.):

> "(d) *Binding authority of agents and brokers; cancellation of coverage after review of application.* — (1) Any agent or broker licensed in Maryland may, subject to the provisions of this section, bind the minimum required coverage for an applicant in the Fund upon application to the agent or broker and payment of the appropriate premium."

MAIF contends, however, that such ruling overlooks the limiting phrase:

> "subject to the provisions of this section."

That reference, MAIF urges, points to the succeeding subsection, § 243B (d) (2) which provides MAIF its rule-making authority in this area.

> "(2) The board shall adopt and make available to each such agent or broker reasonable rules and regulations relating to the binding authority of such agents and brokers, including but not limited to the amount of premium to be collected, the evidence necessary to establish the applicant's qualification to be insured by the Fund, and procedures for notifying the Fund of the binding of coverage."

Thus it seems, having adopted a rule that coverage will not begin until the day following the date a binder is mailed to

it by an agent, MAIF has made the statute "subject" to its rule by virtue of subsection (2).

— the legal question —

We adopt for our legal guidance the precepts of law and authority preliminarily set forth by MAIF.

> "The general principles by which courts are to construe statutes are well known: the cardinal rule is that the court should ascertain the legislative intent and give that intention effect, *Unsatisfied Claim and Judgment Fund Board v. Bowman,* 249 Md. 705, 241 A. 2d 714 (1968); the primary source from which the court finds legislative intent is the language of the statute itself, *Schweitzer v. Brewer,* 280 Md. 430, 374 A. 2d 347 (1977); but if there is no ambiguity or obscurity in the statutory language, the court will not enlarge or extend its application, *Amalgamated Casualty Insurance Company v. Helms,* 239 Md. 529, 212 A. 2d 311 (1965)."

The language in § 243B (d) (1) is unequivocal. The statutory authority provided an agent is elliptically clear:

> "(d) *Binding authority of agents* .... (1) Any agent ... may ... bind the minimum required coverage for an applicant in the Fund upon application to the agent ... and payment of the ... premium."

If we then assume, as does MAIF, that the omitted condition subjected that clear authority to the subsection (2) rule-making authority of the board, we must analyze the extent to which the Legislature authorized MAIF to act. The Legislature permitted MAIF to establish

> "(2) ... reasonable rules ... *relating to* the binding authority ...." (emphasis added).

It did not authorize MAIF to establish reasonable rules "limiting" the agents' binding authority, or "extending" the

agents' binding authority. It obviously was intended to permit *procedural* regulation by MAIF such as the examples set forth by subsection (2) following the generic expression "relating to":

> "including but not limited to *the amount* of premium to be collected, *the evidence* necessary to establish the applicant's qualification to be insured by the Fund, and *procedures* for notifying the Fund of the binding of coverage." (emphasis added).

As stated, the authority to regulate is not limited to these three categories but it is, like the doctrine of ejusdem generis, indicative of the scope of rule-making power granted. Nowhere can it be read into that authority that the Fund is delegated authority to divest or increase an agent's binding authority as statutorily established. It may only procedurally regulate it, but may not interfere with it.

Appellant contends that the rule tracked the former statute which preceded MAIF and reinstated the Legislature's own prior procedure. From this it asks that we read a legislative anticipation into subsection (2) of the adoption of a similar regulatory rule. That would indeed be stretching judicial interpretation of legislative intent. It is more likely that when the Legislature repeals an established limiting provision, and replaces it with one more nearly akin to that customarily used in the industry, it does so knowingly, purposefully and intentionally.

— the factual question —

But our holding that the statute means what it says does not fully answer the purpose of this appeal. The testimony as we view it, is at best equivocal as to whether a binding contract that would provide coverage at the time of the accident, was made between Sparks and the agent. Mr. Sparks recalled the telephone conversation as follows:

> "Q. After you called and announced your intentions, that you thought your insurance policy

was coming due, what did Mr. Jontiff do, if you know?

A. He said to hold on for a minute, and I take it he went to get —

R. LEVIN: I object to what he takes.

THE COURT: Sustained.

THE WITNESS: He got off the phone and — for a few minutes and came back and informed me that it ran out the day before.

BY MR. STEPHENS:

Q. On July 29, 1976?

A. Yes.

Q. What did you say in response to that?

A. 'Okay, Mr. Jontiff, I want to renew my policy.'

Q. And what did he say to that?

A. He said, 'Okay, hold on a minute.' And I heard an adding machine running in the background.

Q. Did you have any conversation with him as concerns the amount of the premium?

A. When he told me that — he told me how much the premium would be.

Q. What was the figure that he gave you?

A. $485.

Q. And what did you say in response to that?

A. 'Okay. Fine. I've got the money in the bank, I'm going to make payment all at once this time.'

Q. Did you ask him at any time during that conversation whether you would be covered by automobile insurance?

A. I'm sorry, I didn't hear the question.

Q. Did you ask him, during that conversation, whether you would be covered?

A. Well, I asked him if it was okay.

Q. What was okay?

A. If I could pay that like that. He said, 'Yes.'

Q. Well, did you ask him whether you would be covered by insurance?

MR. LEVIN: Object to the leading nature of the questions.

THE COURT: Yes, rephrase the question.

BY MR. STEPHENS:

Q. What did you then do after you had the conversation with Mr. Jontiff?

A. After the conversation was completely over?

Q. Yes.

A. I make out the check for the $485, went down, stuck it in the mailbox.

Q. And that was on the same date?

A. Yes, sir.

Q. July 30th?

A. That was 20 minutes later.

Q. After you had the conversation with Mr. Jontiff, what did you feel was the status of your insurance coverage?

MR. LEVIN: I object.

THE COURT: Sustained.

BY MR. STEPHENS:

Q. At any time during the conversation with Mr. Jontiff, did you discuss coverage with him?

A. Yes, sir, I asked him if that was the full payment. I told him I was going to stick it in the mail. He said, 'Fine. Okay. No problem.'

Q. And then after that conversation, or after you deposited the check in the mail, then what happened?

A. Then I went out."

On cross-examination of Mr. Sparks the following transpired:

"Q. Now, what was it that Mr. Jontiff said to you, that led you to believe that you were covered by insurance?

A. The last few words that he said was, 'Okay, no problem, you're taken care of.'

Q. Would you have driven your car that evening if you thought you didn't have insurance?

A. No way, my mother was sitting right there.

Q. Did Mr. Jontiff ever say anything to you about binding or 12:01 a.m., or anything to that effect?

A. No, sir.

. . .

Q. Mr. Sparks, it is a fact that Mr. Jontiff never told you when your coverage would begin, isn't that true?

A. Yes, sir — on which particular time?

Q. On the time we are talking about in 1976, in July of 1976 when you had the conversation.

A. That's correct.

Q. He never told you when coverage would begin, isn't that true?

A. That's correct.

Q. Now, you say, in response to Mr. Petterich's question that you were never told before when coverage would begin, is that correct?

A. That's correct."

The other evidence of what agreement was made as to the date or time of binding, was given by Mr. Zane Jontiff who was at the other end of Mr. Sparks' conversation.

"A. Mr. Sparks called to find out if his policy had expired, or was due to expire. And we discussed that the policy had expired on July the 29th, the previous day, at 12:01 a.m. He then asked the procedure for renewing the policy. And at that time I told him what the cost would be, and what procedure he would have to follow in order to renew the policy.

Q. And then he mailed you a check, is that correct?

A. Well, he mailed me a check that we received the following morning.

Q. And you subsequently sent a binder notice into Maryland Automobile Insurance Fund?

A. On that same day.

Q. Does your file reflect on what day it was posted?

A. The — postmarked? Repeat that.

Q. I asked you on what date does your file reflect that it was posted, not postmarked, when it was mailed.

A. Posted to MAIF?

Q. Yes.

A. On July the 31st.

Q. And on that binder card, did you indicate when coverage was to commence or continue?

A. Yes. As required by MAIF regulations, the coverage was to take effect 12:01 a. m. following date of receipt of the payment. And, therefore, we typed on the binder card August the 1st, 1976."

It appears possible then, that there may have been no meeting of the minds to establish a binding contract of insurance coverage at any definite time.

— renewal —

The factual question arises of whether Mr. Sparks understood that his former policy would be "renewed" without lapse despite its expiration the day before he called the agent. Furthermore, the agent was aware of, had experienced, and offered to document, instances where

"MAIF has received payments following the expiration of a policy and continued that policy in force."

Even if we assume that such retrospective coverage was extended in the past, we are not aware of any authority given it by the Legislature to do so. The trial judge was even more explicit. He could find no instance where the General Assembly addressed the question of renewals:

"The very close reading of the whole section of the law leads us to the inescapable conclusion that the

General Assembly failed to address the question of renewals in the statute itself."

However, by some rather convoluted reasoning, he gleaned such authority from the section that permitted the Fund to discipline agents violating its regulations, § 243B (e):

"[T]he General Assembly, in writing this particular section clearly meant that there would be those instances in which brokers did, in fact, bind people by mistake. And, therefore, I don't think that it is fair to suggest that if a broker, through mistake, binds an individual, that that individual is without coverage. The General Assembly is saying that if in fact that agents or brokers do that, the very fact they said it means that the possibility exists, and, therefore, it is a strong indication of legislative intent. As to the fact that agents or brokers would do this, they would be able to be dealt with from a disciplinary standpoint, and they would forfeit their right to bind in future instances.

So the real reason then arises, of course, as counsel has suggested numerous times, as to whether or not there was a renewal of insurance, or whether or not there was a lapse in insurance and whether or not there was a new policy. For help in this case, I have gone to 243D(c), which says, 'Cancellation for non-payment of premiums. The Fund may, at any time, cancel a policy written by it for non-payment of premiums or for suspension or revocation of the driving license of the policyholder.'

Having read that, then to read backwards to 243B Section d(3), 'The Fund shall become liable under the coverage bound from the date of binding by the agent or broker; provided, however, that the Fund, upon review of the application, may not later than 60 days after the coverage is effective, cancel the coverage and refuse to issue a policy upon the finding that, one, the applicant is not qualified for insurance by the Fund, two, the appropriate

premium has not been paid, or, three, the Fund is authorized to reject the application under 243D; provided, however, that the cancellation is due to non-payment of appropriate premium, the Fund shall afford the applicant a reasonable opportunity to pay the proper premium.'

Now, if you read that over with 243D(c), in which the policy may be canceled for the non-failure — for the non-payment of the premium, it becomes clear, in my judgment, that the premium, the policy may be canceled for the non-payment under 243D, but then 243B requires, by its language, provided, however, that the cancellation is due to non-payment of the appropriate premium, the Fund shall afford the applicant reasonable opportunity to pay the proper payment. That, of course, still doesn't help us, because the real question is one of whether or not this was a new application or whether or not this, in fact, was a renewal.

The law, of course, does not mention anywhere the renewal. I am sure my brothers and former brothers and sister, colleagues in the General Assembly, will be upset in the beginning of my fourth week I am going to write some law for them, and it is not my intention, but I do find, as a fact, and as a matter of law, that they intended, of course, for this particular act to have, from the language in the State Farm Mutual to insure the — try it again — to effectuate — try it again, I'm sorry, to provide that there be a liberal construction in order to effectuate its purpose by assuring recovery for innocent victims of motor vehicle accidents, that that simply means that this statute was intended to provide the maximum insurance coverage for the most number of people. I do find that this is a renewal. I find that for two reasons. Number one, because the testimony of Mr. Pollock indicated that for a period of up to 30 days that renewal form, I think is what he called it, although he called it a renewal form and rewrite

form, and sometimes an application form, what amounts to a different kind of form, one that the applicant does not have to sign, is, in fact, a renewal.

That being the case, the only question left for us, the major question left for us is whether or not he had insurance on that particular day, or did he have insurance under the rules of the Fund at 12:01 a.m. the day after the postmark.

It is my view that, again in returning to the law itself, any agent or broker — I am now reading from 243B (d) 1, 'any agent or broker licensed in Maryland may, subject to the provisions of this section, bind the minimum required coverage for an applicant in the Fund upon application to the agent or broker and payment of the appropriate premium.' "

The judge then addressed the facts:

"I find as a fact that application was made in this particular case, payment was made. It was made in the form, the testimony of Mr. Insurance Man — Mr. Jontiff described, namely that it was all right to put it in the mail. I do not think there was any disagreement that Mr. Jontiff said that was okay. And, therefore, finding as a fact that that section of the law which might be contrary, by the way, to the rules, bound coverage as of the deposit of that in the mail by Mr. Sparks."

As recognized by Judge Ross, the Legislature failed to address itself to renewals. It was, as he surmised, improper for him "to write some law for them." It was not only improper, it was unnecessary and semantically incorrect.

The use of the term "renewal" by Sparks and Jontiff could not apply in this case to a policy that had already expired if that term was used in the sense of "restoring" the old policy which had expired at midnight the night before Sparks called Jontiff. Obviously, had the accident occurred between that midnight expiration on July 29, 1976, and Sparks' call at 11:00 a.m. the morning of July 30, 1976, Jontiff had no authority retrospectively to restore (renew) the old policy, nor

retrospectively to bind Sparks under a new policy.

But in using that term, both Sparks and Jontiff inferentially had no concern for past coverage, only for future coverage. They were unconcerned with renewing in the sense of reviving; rather their interest was in renewing in the sense of repeating so as to reaffirm coverage for the future, beginning at the earliest possible time. That point of beginning was upon application and payment. § 243B (d) (1). Whether that was intended by these two persons and whether or when that was effected, were factual questions that should not have been determined by the judge, but should have been submitted to the jury which sat as the factfinders in this case. *Plitt v. Greenberg,* 242 Md. 359, 367-368 (1966). The applicability of the postal acceptance rule is also a factual question for the jury under appropriate instructions. *Reserve Insurance v. Duckett,* 249 Md. 108, 119-120 (1968); and see *Tayloe v. Merchants' Fire Ins. of Balto.,* 50 U. S. 390. We must therefore, reverse the judgment in this case and remand for an appropriate declaration. The factual issues should be submitted to the jury guided by appropriate instructions from the judge who will include the statutory interpretation which has been the subject of this appeal.

— attorney's fees —

The final question which we have not addressed asks whether the trial court had erred in awarding attorney's fees. The answer is yes, the trial judge did so err.

Ordinarily counsel fees are not awarded in a declaratory judgment action, *New Carrollton v. Belsinger Signs,* 266 Md. 229 (1972); however, such fees and costs may be recoverable where an insurer has unjustifiably refused to defend its insured. *Anderson v. Md. Casualty Co.,* 123 Md. 67 (1914); *Cohen v. Am. Home Assurance Co.,* 255 Md. 334 (1969). In this instance, however, it would appear that the refusal was not totally without justification.

MAIF is not justified by the legal misconstruction of the statute which it compounded by enacting regulations beyond the scope of its authority to so regulate. It is justified on the

396

facts of this case which provide a very close question for determination by the factfinder. Even assuming coverage is found, the problem was created as much by Sparks as it was by Jontiff and MAIF. His belated action which was even then equivocally concluded was partially responsible for the dilemma in which he and his insurer are now embroiled.

We will, however, assess the costs of this appeal entirely upon appellant MAIF. While the factual question justifies the declaratory contractual interpretation, the statutory misconstruction chiefly addressed on appeal was fomented by its own ultra vires act. Md. Rule 1082 a.

> *Judgment reversed, case remanded for retrial.*
> *Costs to be paid by appellant.*