600 A.2d 1178

UNITED STATES FIDELITY & GUARANTY COMPANY

v.

UNITED STATES FIRE INSURANCE COMPANY, et al.

No. 503, Sept. Term, 1991.

Court of Special Appeals of Maryland.

Feb. 4, 1992.

Robert L. Ferguson, Jr. (Christopher J. Heffernan and Thieblot, Ryan, Martin & Ferguson, on the brief), Baltimore, for appellant.

J. Mitchell Kearney (James R. Eyler and Miles & Stockbridge, on the brief), Baltimore, for appellees, U.S. Fire and Shirk.

Alva P. Weaver, III (Weaver and Bendos on the brief), Baltimore, for appellee, Nolt.

Argued before MOYLAN, MOTZ and HARRELL, JJ.

MOTZ, Judge.

This case arises out of a declaratory judgment action brought by appellee, Allen Ray Nolt ("Nolt"), in which Nolt sought a determination of the respective insurance obligations of appellant/cross appellee, United States Fidelity & Guaranty Corporation ("U.S.F. & G.") and appellee/cross-appellant, United States Fire Insurance Company ("U.S. Fire"). Following a jury's special verdict on specific questions of fact, the Circuit Court for Cecil County declared, *inter alia*, that: (1) Nolt was entitled to *pro rata* insurance coverage (including his attorneys fees) from U.S.F. & G. and U.S. Fire arising out of a fatal traffic accident in which

Nolt was the driver at fault; and (2) U.S.F. & G. must bear Nolt's counsel fees and expenses in the declaratory judgment action. We reverse.

### (i)

Nolt is the owner and operator of a 1978 Ford tractor truck. In each year since 1984, Nolt has leased his tractor for one-year terms, beginning December 31 of each year, to Lester R. Summers, Inc. ("Summers"), a company engaged in the interstate transport of property as authorized by the Interstate Commerce Commission ("I.C.C."). Under the agreement, Summers would contact Nolt when a transport job became available and pay Nolt on a per-job basis. The agreement stipulated that, during the term of the lease, Summers held "exclusive possession, control, use and responsibility for the operation of the equipment [the tractor] (including full responsibility to the public, the shippers, and all regulatory agencies having jurisdiction)."[1] The lease further mandated that Summers would provide Nolt's tractor with all necessary I.C.C. identification placards as required under federal law. *See* 49 C.F.R. § 1057.11(c) (1986). Nolt's truck was insured under Summers' policy with U.S.F. & G.; Nolt did not carry his own insurance.

During late 1988, Summers provided Nolt with very little work. According to Nolt, in early December 1988, he visited Lester Summers at his office to pick up his paycheck and inquire as to the availability of future work. Nolt testified that, on this occasion, Summers granted him permission to "haul for someone else" until business revitalized, without requiring that Nolt terminate the existing lease or turn in his I.C.C. placards. On December 5, 1988, Nolt independently called the Charles M. Shirk Trucking Company ("Shirk") in search of an assignment. Shirk agreed to lease Nolt's tractor the next day for a one-day hauling job; Charles Shirk testified at trial that he agreed

---

1. I.C.C. regulations require all I.C.C.-licensed carriers to include such language in their leases. 49 C.F.R. § 1057.12(c) (1986).

to lease Nolt's tractor based on Nolt's representation that Summers had given Nolt permission to seek other employment. Although Summers disputed Nolt's claim that Summers gave Nolt permission to operate the trailer for Shirk for one day, the jury found that Summers did give Nolt permission to operate his truck on December 6, 1988 for Shirk. No party on appeal claims that this finding was clearly erroneous.

Like Summers, Shirk was an I.C.C.-authorized carrier that had been in the business for many years. Nolt had previously transported goods for Shirk, but only as facilitated by Summers. That is, on previous occasions, Shirk contacted Summers, or Summers' dispatcher, when Shirk wanted to hire one of Summers' drivers and tractors and, if drivers and truckers were available, Summers' dispatcher assigned the work to one of Summers' truckers. As with any other outside contract, Shirk would pay Summers for the work and Summers, in turn, would pay the driver, including Nolt on occasion, after keeping a commission for itself.

For the December 6, 1988 trip, and that trip alone, Shirk and Nolt executed a one-day lease which stated that Shirk was to provide Nolt with identification placards, to "assume complete responsibility for the operation of the equipment," and "to provide Insurance only to the extent it is legally obligated to do so for the protection of the public pursuant to ICC regulations." Though the lease was drawn up by Shirk on December 5, 1988, Nolt did not sign the agreement until after the assignment. Nor did Shirk transfer to Nolt any I.C.C. placards to place in the truck, despite such a requirement in the lease and under federal law. Shirk was paid by its customer for the trip and Shirk in turn paid Nolt, keeping the entire commission itself; Summers received no payment for the trip.

On the morning of December 6, 1988, Nolt began his trip to Cecil County, Maryland with a load of concrete under a bill of lading issued by Shirk. Nolt's truck continued to display Summers' I.C.C. placards. Nolt's rig collided with

another vehicle, causing a serious automobile accident, which resulted in the death of one person and the injury of another. Immediately after the accident, Nolt instructed the Maryland State Police to call Shirk. While on his way to the scene of the accident, Charles Shirk contacted both his insurance company, U.S. Fire, and Summers.

Approximately four months after the accident, Shirk, Summers and Nolt were named as defendants in a case filed by the personal representative and survivors of the person killed in the accident. Nolt sought coverage and representation from both U.S. Fire and U.S.F. & G. U.S. Fire agreed to defend Nolt and retained counsel for him. U.S.F. & G. denied coverage of Nolt and refused to participate in Nolt's defense; it did provide a defense to Summers.

On April 18, 1990, Nolt initiated this declaratory judgment action to determine the respective obligations of the two insurance companies. Questions of fact relevant to the interpretation of the U.S.F. & G. insurance policy were submitted to a jury, which found that Nolt had permission from Lester R. Summers, the owner of Lester R. Summers, Inc., to operate his truck on December 6, 1988 for Shirk and that, on December 6, 1988, Nolt's truck was used exclusively in *both* Shirk's and Summers' businesses as truckers.

On February 15, 1991, the circuit court issued a declaration that "Nolt is afforded *pro rata* insurance coverage for the December 6th automobile accident" from U.S.F. & G. *and* U.S. Fire; the court further held the two insurers "jointly liable, on a *pro rata* basis, for the counsel fees and expenses" expended by Nolt in the underlying tort action, and U.S.F. & G. "liable for Nolt's counsel fees and expenses" in the declaratory judgment action.

Further facts will be set forth within as necessary.

(ii)

At issue before us is the "double coverage" of a single vehicle. Double coverage exists when more than one insurance policy covers a claim. *Nat'l Indemnity v. Continental Ins.*, 61 Md.App. 575, 578, 487 A.2d 1191 (1985)

(*citing* 8A J. Appleman, Insurance Law and Practice, § 4907.65 at 364 (1981) [hereinafter *Appleman* ] ). In this situation, often the insurance policy limits the insurer's liability in two ways based on the availability of other coverage. First, an *excess* clause specifies that an insurance company will make payment on a policy so long as: (1) it becomes liable only after the claimant has recovered the sums available under the other policies involved, and (2) it pays an amount equal to the difference between the total insurance paid by the other companies and the limit of its own policy. *Nat'l Indemnity*, 61 Md.App. at 578, 487 A.2d 1191 (*citing* 8A *Appleman* § 4907.65 at 347–349). Second, a *pro rata* clause limits an insurer's liability to its proportionate share in relation to all available coverage. *Nat'l Indemnity*, 61 Md.App. at 578, 487 A.2d 1191 (*citing* 8A *Appleman* § 4907.65 at 345). At the heart of the dispute here are the excess and *pro rata* clauses found in both the U.S.F. & G. policy and the U.S. Fire policy.

Both policies provide coverage for "insureds" in addition to the "named insured," *i.e.*: (1) "anyone [besides the named insured] while using with your permission a covered 'auto' " and (2) "anyone from whom you hire . . . a covered 'auto' . . . while the covered 'auto' is being used exclusively in your business as a trucker" and "is being used pursuant to operating rights granted to you by a public authority." In relevant part, the identical, "other insurance" clauses in each policy provide as follows:

(a) This Coverage Form's Liability Coverage is primary for any "auto" *while hired or borrowed by you and used exclusively in your business as a "trucker" and pursuant to operating rights granted to you by a public authority.* This Coverage Form's Liability Coverage is excess over any covered "auto" while hired or borrowed from you by another "trucker."

\* \* \* \* \* \*

(e) When this coverage form and any other coverage form or policy covers on the same basis, either excess or primary, we will pay only our share. Our share is

the proportion that the Limit of Insurance of our Coverage Form bears to the total of the limits of all the Coverage Forms and policies covering on the same basis.

(emphasis added.)

Section (a) of the "other insurance" provisions constitutes the excess clause; section (e) is the *pro rata* clause. There are well-defined procedures under Maryland law that dictate how one such clause in an insurance policy will be treated when it conflicts with another. Specifically, an excess clause will prevail over a *pro rata* clause. *Consolidated Mut. Ins. Co. v. Bankers Ins. Co.*, 244 Md. 392, 399, 223 A.2d 594 (1966). When both policies provide excess coverage only, liability is shared equally by the insurers. *Ryder Truck Rental, Inc. v. Schapiro & Whitehouse, Inc.*, 259 Md. 354, 364–65, 269 A.2d 826 (1970). A conflict between two *pro rata* clauses results in a proportional sharing of liability without either insurer being considered primary or excess. *Celina Mut. Cas. Co. v. Citizens Cas. Co.*, 194 Md. 236, 241, 71 A.2d 20 (1950). *See also Centennial Ins. v. State Farm Mutual*, 71 Md.App. 152, 158, 524 A.2d 110 (1987). These principles, however, apply *only* if there is a conflict. Under Maryland law, a court's interpretation of a policy must be based on its plain meaning and, if a case involves a claim of double coverage, a court should attempt to reconcile any conflict. *Nat'l Indem. Co. v. Continental Ins. Co.*, 61 Md.App. 575, 487 A.2d 1191 (1985). *See also Nat'l Grange Mut. Ins. Co. v. Pinkney*, 284 Md. 694, 399 A.2d 877 (1979).

Prior to the circuit court's determination of the insurers' legal obligations under the policies, the jury was asked to arrive at a special verdict on the following two questions:

1. Did the Plaintiff, Allen Ray Nolt, have permission from Lester R. Summers, the owner of Lester R. Summers, Inc., to operate his truck on December 6, 1988 for Charles M. Shirk Trucking Company?

YES___ NO___

2. If you voted "yes", then you must answer the following question.

On December 6, 1988, was Mr. Nolt's truck used exclusively in Shirk's or Summers' business as trucker[?]

SHIRK___ or SUMMERS___

To the first question, the jury answered "yes"; Summers did give Nolt permission to operate his truck for Shirk. This question was critical to the determination of whether U.S.F. & G. had *any* liability in this case. If the jury had answered this question in the negative, U.S.F. & G. would have had no coverage responsibility here. It is conceded that the jury's affirmative answers mean that, at the very least, U.S.F. & G. is an excess insurer of Nolt because he is a covered "insured," *i.e.*, using the vehicle with Summers' permission, under U.S.F. & G.'s policy with Summers.

The significance of the second question is not as clear. Apparently, it was originally propounded in an effort to assist the judge in determining which company was the primary insurer of Nolt.[2] Both the policy that U.S.F. & G. issued to Summers and the policy that U.S. Fire issued to Shirk provided primary insurance to a covered auto *only* while (1) "used exclusively" in the trucking company's "business as a 'trucker' " and (2) "pursuant to [the trucking company's] operating rights granted to" it "by a public authority." If the jury had answered that Nolt's truck was "used exclusively" in Shirk's *or* Summers' business on December 6, 1988, and this verdict was based on any evidence, the first factor as to primary coverage would have

---

**2.** Interestingly, in light of the jury's answer, is the fact that U.S. Fire objected to this question below. U.S.F. & G., after being denied its motion for judgment, specifically requested and formulated the question.

been determined.[3]

The jury did not answer this question, however, in the originally proposed "either-or" fashion. Rather, prior to its deliberations, the jury asked for and received the court's permission, over U.S.F. & G.'s objection, to answer this question as "Shirk," or "Summers," or "both." The jury then answered the question that Nolt's truck was, in fact, used "exclusively" in *both* Shirk's and Summers' businesses as truckers. Upon hearing this, the trial court, which had during the trial repeatedly stated that U.S.F. & G. and Summers were entitled to a "directed verdict" that Nolt's truck was used exclusively for Shirk on the day of the accident, concluded that this was "not quite a clear question." The court explained, "Aside [from] the jury verdict, there's no question there was a lease signed, exclusive, but you have another lease signed also saying exclusive, which was not terminated, and you also have the I.C.C. placard and number on the other vehicle, and the I.C.C. statute says that you must have insurance to protect the public." For this reason, the circuit court "rule[d] you're [U.S.F. & G. and U.S. Fire] jointly and severally liable up to this point—you have the excess."

U.S.F. & G. claims that the circuit court erred in permitting the jury to find that Nolt's truck was used "exclusively" in *both* Shirk's and Summers' business because, it asserts, the undisputed facts establish that Nolt's truck was used exclusively in Shirk's business. Accordingly, U.S.F. & G. contends that no conflict exists between the two policies, that U.S. Fire provided primary coverage to Nolt, and that U.S.F. & G. provided only excess coverage. U.S. Fire[4]

---

3. As to the second factor, it is undisputed that Nolt was driving pursuant to the "operating rights" granted by the I.C.C. to both Summers and Shirk. Thus, the first factor is determinative here.

4. Nolt also seeks to have the circuit court's decision upheld. Most of his argument, however, is directed at issue (v) herein, *i.e.,* the declaration that U.S.F. & G must pay all of Nolt's fees in the declaratory judgment action and a portion of them in the underlying tort action.

claims that either the two policies conflict, *i.e.*, both provide primary coverage or both provide excess coverage, and, therefore, the circuit court's proration of liability between U.S.F. & G. and U.S. Fire was correct under the rules enunciated in *Ryder Truck* and *Celina Mutual* or, in the alternative, that the U.S.F. & G. policy provides primary coverage.

### (iii)

The parties agree that the basis for the lower court's holding is a conflict between the two policies. The only possible basis for such a conflict is evidence that: (1) either Nolt's truck was used exclusively in *both* Summers' business and Shirk's business *and* pursuant to operating rights granted to each carrier; or (2) Nolt's truck was not used exclusively by, and pursuant to, the operating rights of either carrier. In the former situation both carriers would be primary;[5] in the latter both would be excess. In either

---

To the extent Nolt makes any argument as to the other issues he follows U.S. Fire's position.

**5.** Both policies also require that an "auto" be "hired" or "borrowed" by the insured in order for coverage to be primary. U.S. Fire asserts that the "logo liability" rule should be applied here and requires the conclusion that Nolt's truck was hired by Summers on December 6, 1988. The "logo liability" rule has arisen from an I.C.C.-mandated lease provision discussed *infra* at part iv. A number of courts have held that, because of the I.C.C.-mandated lease provision, when "a carrier lessee permits a lessor [truck owner] to use its [the carrier's] authority it is responsible" to a tort victim "for injuries caused thereby even if the lessor is embarked on an undertaking of his own while using the authority." *Rediehs Exp. Inc. v. Maple*, 491 N.E.2d 1006, 1009 (Ind.App.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 762 (1987). *See also Rodriguez v. Ager*, 705 F.2d 1229 (10th Cir.1983); *Mellon Nat'l Bank & Trust Co. v. Sophie Lines*, 289 F.2d 473 (3rd Cir.1961). *But see Wilcox v. Transamerican Freight Lines*, 371 F.2d 403 (6th Cir.), *cert. denied*, 387 U.S. 931, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967); *Gudgel v. Southern Shippers, Inc.*, 387 F.2d 723 (7th Cir.1967). Thus, the "logo liability" rule has been applied in tort actions to make a lessee a statutory employer of the driver and so liable on principles of respondeat superior for the negligence of the driver. There is no need to reach the question of whether the "logo liability" rule should be applied in this declaratory judgment action to make Summers the statutory employer of Nolt because here it is

situation, the policies would be regarded as conflicting and *pro rata* coverage would then be required. *Ryder*, 259 Md. at 364–65, 269 A.2d 826; *Celina Mutual*, 194 Md. at 241, 71 A.2d 20. Since each policy provides an identical amount of coverage—$1 million—the coverage liability of U.S.F. & G. and U.S. Fire would be equal.

In arguing that the circuit court's holding be affirmed, U.S. Fire concedes, as it must, that on December 6, 1988, Nolt was operating under a bill of lading with Shirk, hauling cargo for Shirk, pursuant to Shirk's instructions. It claims, however, that the December 6 trip was identical to a number of other trips in which Shirk hired a driver, under an annual lease to Summers, for a day trip, and the driver hauled cargo for Shirk, under Shirk's bill of lading, following Shirk's instructions *but* pursuant to the driver's lease with Summers, under Summers' I.C.C. placards and *Summers' insurance*. For this reason, U.S. Fire asserts there is evidence that Nolt's truck was used "exclusively" and pursuant to the operating rights of *both* Summers and Shirk—or used "exclusively" by neither.

We have searched the record to find evidence to support this theory. There is none. Rather, a number of undisputed facts render it impossible. Accordingly, we reverse. *See Canal Ins. Co. v. First General Ins. Co.*, 889 F.2d 604, 607 (5th Cir.1989) (appellate court found facts underlying district court's declaratory judgment as to liability of insurer of tractor's lessor were "clearly erroneous" and so reversed).

First, Nolt and Shirk were in direct contact prior to this trip and contracted directly for this trip. On every other occasion in which Nolt hauled Shirk's freight, Shirk had contacted Summers or Summers' dispatcher and contracted with Summers for one of Summers' drivers and trucks. Second, Nolt and Shirk executed a day-trip lease evidencing their direct contract in which they agreed that Nolt gave

---

undisputed that Nolt's truck was under lease to, and therefore *hired* by, *both* Summers and Shirk on December 6, 1988.

Shirk "exclusive and unrestricted control and possession" of the tractor and that Shirk was to provide Nolt with I.C.C. identification placards for the trip, assume "complete responsibility for" the truck's "operation," and provide liability insurance as required by the I.C.C.[6] On no other occasion had Shirk executed a lease directly with a driver under lease to Summers; rather, previously, Shirk's contact and contract were with Summers, and the only lease at issue was Summers' lease with the driver. Third, although Shirk did not supply Nolt with the required I.C.C. identification placards, Shirk himself testified that this was *not* because he thought Nolt was working for Summers but because Shirk "forgot" to give Nolt the placards. Thus, according to Shirk's own testimony, Nolt's truck was being driven under Summers' placards, rather than Shirk's, simply because of Shirk's mistake.

Fourth, although here, as on prior occasions, when Shirk had contracted with Summers to have a Summers driver haul a load for Shirk, Shirk had prepared a bill of lading, on previous occasions Summers had *also* prepared a bill of lading. For the December 6 trip no bill of lading was prepared by Summers. Fifth, Nolt and Shirk testified unequivocally that Nolt was working for Shirk, not Summers, on December 6, 1988. Sixth, it is similarly undisputed that Nolt asked the Maryland State Police at the accident to call Shirk, not Summers, and Nolt was in contact with U.S. Fire, not U.S.F. & G., with regard to coverage for the accident. Finally, in Nolt's daily log, which he was required to keep by I.C.C. regulations and which he signed and certified to be true and correct, he stated that Shirk was the I.C.C. carrier for whom he drove on the December 6, 1988 trip. Indeed, Nolt specifically scratched out Summers' preprinted

---

**6.** Shirk testified that he and Nolt orally agreed to terms and he drew up the day trip lease himself the night *before* the accident, but Nolt did not sign it until the next day, right after the accident; Nolt testified that he executed it before the accident. In any event, no party disputes the existence of a valid day-trip lease between Shirk and Nolt was in effect for December 6, 1988, the day of the accident.

name and address as the carrier and wrote in Shirk's name and address. On no other occasion did Nolt certify in his daily log that he was working for Shirk rather than for Summers.[7]

■ In sum, there are simply no facts to support the finding that on December 6, 1988, Nolt's truck was used exclusively in Summers' business. Rather, the evidence is uncontroverted that Nolt's truck was used exclusively in Shirk's business, hauling Shirk's load for Shirk's customers, in accord with Shirk's bill of lading, as agreed to in a lease between Nolt and Shirk (to which Summers was not a party), in which Shirk contracted to assume complete responsibility for Nolt's truck. All of the parties so testified. Moreover, this is indicated on all contemporaneous documents, none of which were prepared by Summers, *i.e.*, the day-trip lease and the bill of lading, both of which were prepared by Shirk, and Nolt's daily log, which Nolt prepared and certified to be correct. Accordingly, Summers' insurer, U.S.F. & G., was entitled to a judgment as a matter of law that U.S. Fire's coverage was primary for Nolt's tractor because, on December 6, 1988, Nolt's truck was

---

**7.** There is one other significant difference between the December 6 trip and other occasions on which Nolt drove for Shirk. That is the method and amount of payment to the parties. For the December 6 trip, Shirk paid Nolt directly a percentage of the gross amount he (Shirk) received from his customer for the trip. On all other occasions Shirk paid Summers a percentage of the gross amount Shirk received from his customer, and Summers, in turn, paid Nolt after retaining a commission for itself. Apparently, no arrangements as to method or precise amount of payment (it was agreed that it would be the normal percentage) were made by Shirk and Nolt prior to the accident. Shirk testified that, a few days after the accident, he discussed Nolt's payment with Summers who said, "You just pay him and let me out of it." Summers testified he did not remember that conversation but did not dispute it, explaining: "I'm not involved, I haven't been involved in this thing from Monday to Friday. Why would I want to get involved in it Saturday? The whole thing's over with. I haven't been involved in it." Contrary to U.S. Fire's contention, this does not appear to be simply a "hindsight" deviation from normal routine; however, because there was no agreement as to direct payment *prior* to the accident, that factor is *not* part of our analysis set forth in the text of this opinion.

hired by Shirk, pursuant to "operating rights" granted to Shirk by the I.C.C., and was "used exclusively" in Shirk's, and only Shirk's, business as a "trucker."

(iv)

Nor do certain I.C.C.-mandated provisions in the leases and insurance policies at issue here, which the circuit court apparently relied upon, require a different result. In 1956, Congress amended the Interstate Commerce Act to allow the I.C.C. to prescribe regulations to ensure that motor carriers would be fully responsible for the operation of vehicles they leased. *See* 49 U.S.C. § 304 (1956) (revised and recodified at 49 U.S.C. § 11107 (1978)).[8] I.C.C. certified carriers are now required to maintain "exclusive possession, control and use of the equipment for the duration of the lease," and "assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. 1057.12(c). Both the Summers–Nolt annual lease and the Shirk–Nolt day-trip lease contained such a provision.

In addition, I.C.C.-certified carriers must maintain insurance or another form of surety so that the carrier is prepared to " 'Pay any final judgment recovered against such motor carrier for bodily injuries to or death of any person resulting from the negligent operation, maintenance, or use of motor vehicles' under the carrier's permit." *Empire Fire and Marine Ins. Co. v. Guaranty Nat'l Ins. Co.,* 868 F.2d 357, 362 (10th Cir.1989) (*quoting* 49 C.F.R. § 1043.-1(a)). The I.C.C. enforces this regulation by requiring the

---

**8.** Prior to Congress's action, the use by truckers of leased or borrowed vehicles led to a number of abuses threatening public safety. ICC-licensed carriers used leased vehicles to avoid safety regulations governing equipment and drivers; in addition, the use of non-owned vehicles led to public confusion as to who was financially responsible for accidents caused by those vehicles. *See Empire Fire Marine Ins. Co. v. Guaranty Nat'l Ins. Co.,* 868 F.2d 357, 362 (10th Cir.1989) (*citing American Trucking Ass'ns v. United States,* 344 U.S. 298, 304–05, 73 S.Ct. 307, 311–12, 97 L.Ed. 337 (1953); *Mellon Nat'l Bank & Trust Co. v. Sophie Lines, Inc., supra,* 289 F.2d at 477).

following endorsements in insurance policies obtained by I.C.C. certified carriers:

It is understood and agreed that no condition, provision, stipulation or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described.

*See* 49 C.F.R. § 1003.3. Both Summers' policy with U.S.F. & G. and Shirk's policy with U.S. Fire contained such an endorsement.

This endorsement is intended to negate any clauses in the body of a carrier's insurance policy to which it is attached that would have the effect of limiting that carrier's insurance liability; an "excess coverage" clause is such a "condition" or "limitation" that could "relieve a company of liability." *See Empire Fire*, 868 F.2d at 363. Because an excess coverage clause is the type of limitation rendered ineffective by the I.C.C. endorsement, a general rule has emerged in some jurisdictions that an I.C.C.-endorsed policy which contains an excess coverage clause is "treated as affording primary coverage." *Id.* U.S. Fire asserts that this endorsement in the U.S.F. & G./Summers policy means that U.S.F. & G. is the primary insurer. Relying upon *Transamerican Freight Lines, Inc. v. Brada Miller Freights Systems, Inc.*, 423 U.S. 28, 96 S.Ct. 229, 46 L.Ed.2d 169 (1975), U.S.F. & G. claims that this endorsement only applies when protection of the public is at stake and cannot be invoked by one insurance company against another in a suit like the one at hand. In *Brada Miller*, the Supreme Court made clear, albeit in another context, that the I.C.C. regulations, placing on the lessee the non-delegable responsibility for control of the vehicle and provision of liability insurance, existed for the protection of the public, not for the purpose of resolving matters between the parties themselves. "The party responsible in law to the injured or damaged person may seek indemnity from the

party responsible in fact," the Court said. 423 U.S. at 40, 96 S.Ct. at 235.

Federal courts have taken one of three positions with respect to the effect of similar I.C.C. endorsements in cases between insurance companies: (1) the endorsement makes the insurance policy to which it attaches primary as a matter of law over other policies which lack such a provision, *Hagans v. Glens Falls Ins. Co.*, 465 F.2d 1249 (10th Cir.1972); *Argonaut Ins. Co. v. Nat'l Indem. Co.*, 435 F.2d 718 (10th Cir.1971); (2) the endorsement negates all limiting language in the policy to which it is attached, but does not establish sole primary liability as a matter of law, *Empire Fire & Marine Ins. Co. v. Guaranty Nat'l Ins. Co.*, 868 F.2d 357 (10th Cir.1989);[9] or (3) the endorsement applies only in cases involving claims by a shipper or a member of the public, it does not apply when allocating liability among insurance carriers, and the courts review the language of the insurance policies and state insurance contract law to determine the relative responsibility of insurance carriers. *Travelers Ins. Co. v. Transport Ins. Co.*, 787 F.2d 1133, 1140 (7th Cir.1986); *Carolina Cas. Ins. Co. v. Ins. Co. of*

---

9. U.S. Fire asserts that *Federal Ins. Co. v. Allstate Ins. Co.*, 275 Md. 460, 341 A.2d 399 (1975), adopted either the first or second position set forth above, both of which are espoused chiefly in Tenth Circuit cases. In *Federal*, the Court of Appeals, in affirming this court, held that the I.C.C. endorsement changed the normal order of priority of policies with conflicting "other insurance" clauses and rendered the policy containing the I.C.C. endorsement primary as a matter of law. 275 Md. at 477–480, 341 A.2d 399. Two things are noteworthy about *Federal*. First, it predates the Supreme Court's decision in *Brada Miller* and the more recent federal cases adopting a different position in response to *Brada Miller*. Second, and more important for the case at hand, *Federal*, like all of the other cases adopting the first or second position set forth in text above, involved only *one* insurance policy that had an I.C.C. endorsement. Indeed, the late Chief Judge Gilbert, speaking for this court in *Federal*, noted this and distinguished the situation in *Federal* from that in *Carolina Cas. Co. v. Transport Indem.*, 488 F.2d 790 (10th Cir.1973) for this very reason. *See Allstate Ins. Co. v. Federal Ins. Co.*, 23 Md.App. 105, 118, 326 A.2d 29 (1974), *modified, Federal Ins. Co. v. Allstate Ins. Co.*, 275 Md. 460, 341 A.2d 399 (1975). Accordingly, *Federal*, like other cases having only one insurance policy with an I.C.C. endorsement, is inapposite here.

*North America*, 595 F.2d 128, 138 (3rd Cir.1979); *Carolina Cas. Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d 304, 313 (5th Cir.1978); *Carolina Cas. Ins. Co. v. Transport Indem. Co.*, 533 F.Supp. 22, 25 (D.S.C.1981), *aff'd*, 676 F.2d 690 (4th Cir.1982) (unpublished opinion), *cert. denied*, 459 U.S. 829, 103 S.Ct. 65, 74 L.Ed.2d 66 (1982).

 Although the parties spend a great deal of time arguing which of these theories is most reasonable and which of these cases we should follow, in fact, these theories are irrelevant and these cases are inapposite here. This is so because, here, in contrast to all of the cases cited above, *two* insurance policies with the I.C.C. endorsements are involved. In such a situation it is well recognized, even by courts which find the I.C.C. endorsement determinative in disputes between insurance companies, that a different rule is applicable. *See, e.g., Railhead Freight Systems, Inc. v. U.S. Fire Ins. Co.*, 924 F.2d 994, 996 (10th Cir.1991); *Empire Fire and Marine Ins. v. Guaranty Nat'l Ins., supra,* 868 F.2d at 365 (dicta); *Carolina Cas. Co. v. Transport Indem. Co., supra,* 488 F.2d at 790. Indeed, both U.S. Fire and U.S.F. & G. agree, citing, quoting, and relying upon the same case, that:

> It comports with common sense to hold that, when more than one policy contains an ICC endorsement, the insurance company providing coverage to the person or company *whose ICC authority was implicated is the primary insurer.*

*Empire Indem. Ins. Co. v. Carolina Cas. Indem. Co.*, 838 F.2d 1428, 1432 (5th Cir.1988) (emphasis added). Thus, the critical question here is, not *should* the insurer with the I.C.C. endorsement be the primary insurer, but *which* insurer with the I.C.C. endorsement should be the primary insurer. This depends upon which carrier's I.C.C. authority was "implicated"—Shirk's or Summers'. Maryland law, the policies at issue here, and the facts of this case, as demonstrated within, permit only one answer to that question. On December 6, 1988, Nolt's truck was used "exclusively" in Shirk's business; thus, it was Shirk's I.C.C. authority that

was "implicated," and Shirk's insurer, U.S. Fire, is the primary insurer.

(v)

In addition to issuing a declaration that Nolt was entitled to *pro rata* insurance coverage from U.S.F. & G. and U.S. Fire, the circuit court also declared that U.S.F. & G. "is liable for the counsel fees and expenses of the Plaintiff in bringing this Declaratory Judgment action" and U.S.F. & G. and U.S. Fire are "jointly liable, on a *pro rata* basis, for the counsel fees and expenses expended" in the defense of Nolt in the underlying tort action. Because of our holding that U.S. Fire was the primary insurer here and U.S.F. & G. provided only excess coverage, we must reverse the award of these fees against U.S.F. & G. with respect to the underlying tort action. Moreover, because U.S.F. & G.'s obligation to defend Nolt was never triggered, we reverse the trial court's order that U.S.F. & G. pay Nolt's costs in the declaratory judgment action.

Under Maryland law, an insurer has the duty to defend its insured if there is a *potentiality* that a claim could be covered by a policy. *See, e.g., Continental Cas. v. Board of Education,* 302 Md. 516, 528, 489 A.2d 536 (1985); *Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 407–408, 347 A.2d 842 (1975); *Eastern Shore Financial Resources, Ltd. v. Donegal Mut. Ins. Co.,* 84 Md.App. 609, 617, 581 A.2d 452 (1990), *cert. denied,* 322 Md. 131, 586 A.2d 13 (1991). A primary insurer's duty to defend is triggered if a reasonable evaluation of the policy determines that its language and requirements, coupled with the nature of the action against the insured, would necessitate coverage if the action were successful, even if that action is frivolous. *See Ohio Cas. Ins. Co. v. Lee,* 62 Md.App. 176, 187, 488 A.2d 988, *cert. denied,* 303 Md. 471, 494 A.2d 939 (1985) (*citing St. Paul Fire and Marine v. Pryseski,* 292 Md. 187, 194, 438 A.2d 282 (1981)).

In contrast, an excess insurer's duty to defend, and thus its "potentiality" of coverage, does not arise until

the full amount of the primary policy is actually exhausted. *Fireman's Fund Ins. Co. v. Rairigh,* 59 Md.App. 305, 322–23, 475 A.2d 509 (1984). Exhaustion of primary coverage is a prerequisite to an excess carrier's duty to defend; that duty does not arise simply where the claims asserted against the insured exceed the policy limits of the primary insurer. *Id.* This rule has emerged in recognition that "the demand in a complaint frequently has little relation to the true value of the claim." 7C *Appleman* § 4682 at 33.[10]

■ Here, the plaintiff in the underlying tort action sued Nolt for more than $4 million. U.S.F. & G., Nolt's excess insurer, made no promise in its contract to defend Nolt in claims prior to exhaustion of the primary policy. U.S. Fire, Nolt's primary insurer, provided him with primary coverage of $1 million; the underlying tort case against Shirk and Nolt settled for significantly less than that. Accordingly, U.S.F. & G.'s duty to defend Nolt under the excess clause was never triggered because his primary insurance covered the full amount of the settlement of the underlying tort claim. U.S.F. & G., therefore, is not liable for the expenses incurred in Nolt's defense in the underlying tort action.

■ Similarly, U.S.F. & G. is not liable for Nolt's costs of prosecuting this declaratory judgment action. Un-

---

**10.** A number of additional arguments support the rule against requiring an excess carrier to defend an insured when the initial duty properly rests with the primary insurer. For example, a primary insurer should not be able to avoid or reduce its obligations under an insurance contract, simply because the insured happens to be privy to an excess policy. *See, e.g., Transport Indem. Co. v. Home Indem. Co.,* 535 F.2d 232, 238 (3rd Cir.1976); *Aetna Cas. & Surety Co. v. Certain Underwriters,* 56 Cal.App.3d 791, 806, 129 Cal.Rptr. 47 (1976). Moreover, requiring an excess insurer to provide insurance before the exhaustion of the primary limits "invites a change of attorneys and other staff ... and can subject the insured to questions as to who will provide him with a defense." 7C *Appleman* § 4682 at 32. *See also Raymond v. Monsanto Co.,* 329 F.Supp. 247 (D.N.H.1971). Furthermore, as long as the "primary carrier is providing a defense that it should be giving to the insured, the insured is not being prejudiced because the excess insurer has not entered into the defense of the claim." 7C *Appleman* § 4682 at 31.

der Maryland law, an insurer is required to pay the insured's expenses in a declaratory judgment action where the insurer's refusal to defend is unjustified.[11] *Cohen v. American Home Assur. Co.*, 255 Md. 334, 258 A.2d 225 (1969); *See also, Bankers & Shippers Ins. Co. v. Electro Enter.*, 287 Md. 641, 648, 415 A.2d 278 (1980); *Travelers Indem. Co. v. Ins. Co. of North America*, 69 Md.App. 664, 680, 519 A.2d 760 (1987); *Maryland Auto Ins. Fund v. Sparks*, 42 Md.App. 382, 395, 400 A.2d 26 (1979). For example, in *Maryland Auto Ins. Fund v. Sparks, supra,* we held that, despite a finding that the insurer owed the insured a duty to defend, the insured was *not* required to pay the insured's attorney fees in the declaratory judgment

---

**11.** Other jurisdictions are divided over the issue of when, if ever, an insurer must pay for an insured's declaratory judgment action to determine a duty to defend. *See generally* Annotation, *Insured's Right to Recover Attorney's Fees Incurred in Declaratory Judgment Action to Determine Existence of Coverage Under Liability Policy,* 87 A.L.R.3d 429 (1979). First, some courts adhere to the "American Rule" of attorney's fees, which mandates that, in the absence of a contractual provision, statute, or recognized ground of equity, attorney's fees in a declaratory judgment action are not recoverable, even though an insurer's duty to defend is found to exist. *See, e.g., Kremers–Urban Co. v. American Employers Ins. Co.,* 119 Wis.2d 722, 351 N.W.2d 156, 167–68 (1984); *Farmer's Ins. Co. v. Rees,* 27 Wash.App. 369, 617 P.2d 747, 749 (1980), *aff'd,* 96 Wash.2d 679, 638 P.2d 580 (1982). Second, other courts permit recovery if it can be shown that the insurer acted in bad faith, fraudulently, unreasonably, or was stubbornly litigious. *See, e.g., American Family Life Assur. Co. v. U.S. Fire Ins. Co.,* 885 F.2d 826, 834–35, *reh'g denied,* 892 F.2d 89 (11th Cir.1989); *Montgomery Ward & Co., Inc. v. Pacific Indem. Co.,* 557 F.2d 51, 60 (3rd Cir.1977); *Western Casualty & Surety Co. v. Marchant,* 615 P.2d 423, 427 (Utah 1980); *American Family Mutual Ins. Co. v. Brown,* 631 S.W.2d 375, 379 (Mo.App.1982). The third segment of courts hold that, "where a declaratory judgment action is filed to determine whether an insurer has a duty to defend its insured under its policy, if the insurer is found to have such a duty, its insured is entitled to recover reasonable attorney's fees arising from the declaratory judgment action." *Aetna Casualty & Surety Co. v. Pitrolo,* 342 S.E.2d 156, 161–62 (W.Va.1986). *See also Green v. J.C. Penney Auto Ins. Co., Inc.,* 806 F.2d 759, 765–66 (7th Cir.1986). Maryland law falls closest to the second group of cases; when an insured in Maryland initiates a declaratory judgment action against an insurer in Maryland, the insurer is required to pay the insured's expenses in that action where the refusal to defend is *unjustified.*

action due to the "facts of this case which provide a very close question for determination by the fact finder." 42 Md.App. at 396, 400 A.2d 26. Similarly, here the question of whether or not Nolt was covered even by the excess provision of the U.S.F. & G. policy was a "very close question for determination by the fact finder." There was a conflict in Summers' and Nolt's recollection of their conversation as to Nolt obtaining Summers' permission to drive the truck for others. The jury chose to believe Nolt; but the decision could have gone either way on this issue. Thus it well may be that U.S.F. & G.'s refusal to provide even excess coverage was justified. We need not reach that issue because its obligations as an excess carrier were never triggered. We have found no case where, as here, an insurer which refused to acknowledge its status as excess carrier was thereafter required to assume the insured's declaratory judgment costs, when the primary insurer assumed all liability in the underlying tort action. Given U.S. Fire's prompt assumption of its duty to defend Nolt, there was never a time when Nolt faced the prospect of no defense. Accordingly, U.S.F. & G. is not liable for Nolt's costs in this action.

JUDGMENT REVERSED.

COSTS TO BE PAID BY APPELLEES.